### In re PETTERS COMPANY, INC., et al, Debtors.

(includes: Petters Group Worldwide, LLC; PC Funding, LLC; Thousand Lakes, LLC; SPF Funding, LLC; PL Ltd., Inc. Edge One LLC; MGC Finance, Inc.; PAC Funding, LLC; Palm Beach Finance Holdings, Inc.).

Nos. 08–45257, 08–45258(GFK), 08–45326(GFK), 08–45327(GFK), 08–45328(GFK), 08–45329(GFK), 08–45330(GFK), 08–45331(GFK), 08–45371(GFK), 08–45392(GFK).

United States Bankruptcy Court, D. Minnesota.

July 12, 2013.

As Amended Aug. 30, 2013.

Richard B. Drubel, Ethan Frechette, Matthew J. Henken, Kimberly H. Schultz, Boies, Schiller & Flexner LLP, Hanover, NH, James A. Lodoen, Jeffrey D. Smith, Lindquist & Vennum P.L.L.P, Minneapolis, MN, for Debtor.

## SECOND MEMORANDUM ON "CONSOLIDATED ISSUES" TREATMENT OF MOTIONS FOR DISMISSAL IN TRUSTEE'S LITIGATION FOR AVOIDANCE AND RECOVERY: ADEQUACY OF PLEADING FOR TRUSTEE'S STANDING, DISCOVERY ALLOWANCE, AND FRAUD; OPERATION OF PONZI SCHEME PRESUMPTION

GREGORY F. KISHEL, Chief Judge.

### PREFACE

The origin and purpose of these memoranda were set forth in the preface to the

first such in these cases [Dkt. No. 1951]. In brief, however:

This memorandum is entered, to memorialize rulings on issues raised in an underlying docket of more than two hundred adversary proceedings. By this litigation, the trustee for these cases seeks to recover massive amounts of money paid in the past to the defendants, by or through the Debtor-entities. For years before 2008, one Thomas J. Petters used the Debtor-entities to operate a large-scale Ponzi scheme. He made massive use of several forms of loan-based financing to support the scheme.[1] After the collapse of the scheme in 2008, the last lenders to the Debtors were left unpaid and unsatisfied to the extent of over 3.5 billion dollars.

The Trustee sued numerous recipients of such payments. He seeks to recover monies disbursed to them over an extended period of time before 2008, on the ground that the payments were all made in connection with and in furtherance of the Ponzi scheme,.and hence had a fraudulent character. The judgments he seeks vary widely in amount, from a few thousand dollars to hundreds of millions. Colloquially, this sort of legal undertaking to remediate a failed fraudulent scheme is called a "clawback."

As the primary substantive basis for the relief he seeks, the Trustee characterizes the transfers as fraudulent within the meaning of the Minnesota Uniform Fraudulent Transfer Act, Minn.Stat. §§ 513.41–513.51 ("MUFTA"), hence avoidable at his instance, 11 U.S.C. § 544(b), and subject to recovery via money-judgment to be granted the bankruptcy estates of the underlying Debtors, 11 U.S.C. § 550(a). The monies so recovered would then fund a distribution through the administrative process in bankruptcy. The recipients would be those creditors of the Debtors that were "left in" and unsatisfied at the end, as well as other holders of allowed claims.[2]

As massive as this docket was, its common origins offered some avenues to simplify the initial judicial administration. These memoranda are one such expedient. Issues posed by particular defendants through early motions for dismissal were selected if they were purely legal in nature—i.e., those going to the adequacy of the Trustee's pleading, and those going to the choice of a substantive rule of decision if the underlying law was not settled in this jurisdiction. Issues that were common to a significant number of defendants were identified and grouped. The Trustee filed a consolidated responsive brief in the file for the main cases. Supplementary briefing was allowed for the defense. A controlled sequence of oral argument was entertained.

These procedures did not make the issues themselves any simpler; many were

---

1. Counsel for the Trustee and numerous parties tend to use the term "investors" to signify the lenders on such financing. Strictly speaking, the term is not accurate, if one conceives of "investment" as infusion for the receipt of equity, for the purchase of third-party securities, or even on bond financing. Tom Petters did not structure his operation around any of these vehicles. So, the term "investor" will generally be eschewed in this and further rulings on the Trustee's litigation. If it is used, however, it will denote a lender on a borrowing by one of the Debtors.

2. A claim may be allowed in favor of a defendant that has been held liable to the estate on account of an avoided transfer, at least where the avoidance undoes the satisfaction of (and arguably revives) a pre-petition debt of the debtor *and* the transferee makes good to the estate by satisfying the judgment. 11 U.S.C. §§ 502(h) and 502(d).

matters of first impression in this jurisdiction, many were initially confounding. However, it did queue them up.

The court's contemplation was to address these issues by rulings of general applicability to the whole litigation docket. In part, this was to provide a platform for the disposition of each defendant's motion for dismissal. In equal part, it was intended to better "position" the sides for settlement discussions or structured mediation, were defendants amenable to that avenue.

The first result of this "consolidated issues" process was the entry of the first memorandum. That one covered the deepest issue with most impact on the defendants collectively—the choice of the statute of limitations—plus other matters going to the timeliness of suit. The group of issues for this second memorandum is not quite as tightly focused in a conceptual sense; it ranges over several substantive areas. But in a sense, it is more immediate; its subject is something one can physically look at, read, and evaluate. These issues fit more readily into the common understanding of a motion for dismissal under Rule 12(b)(6); they mainly go to the content and adequacy of the Trustee's fact pleading, as to key aspects of his theories of suit. One of the issues is a carryover from the order of business for the first group, transplanted because it fits better with the rationale for this memorandum.[3]

## INTRODUCTION TO SECOND MEMORANDUM

Three subclasses of issues were presented on the second day of oral argument. All three went to the content-oriented function of Rule 12(b)(6). The defendant-proponents seek dismissal on the ground that the Trustee's complaints do not set forth facts great enough in number, nature, or specificity, to make out a plausible *factual* basis for relief in avoidance of fraudulent transfers under the legal authority invoked.

The third subclass also went to the *legal* basis of one of the Trustee's theories of recovery, i.e., whether the Trustee has the benefit of a presumption to establish an ultimate fact, a specific subjective intent on the part of the Debtor-transferor, and how that presumption would apply to variant fact patterns. As it turned out, the legal issue (whether to recognize the presumption) was more appropriately treated as a threshold to the pleading-centered issue (whether the Trustee's complaints recite enough facts to trigger the presumption). So, for the organization of this memorandum, the third subclass was merged into one of the other two.

## PLEADING STANDARDS, IN GENERAL

### A. Rule 8(a)

Fed.R.Civ.P. 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is

---

**3.** For the internal titling of this memorandum, the issues will be numbered sequentially with those treated in the first memorandum. The first memorandum's conventions will be used for the references to the parties and some of their written submissions—"the Trustee" for the Plaintiff, "the defense" for the proponents, collectively, of a particular theory for dismissal. "PCI" will signify Debtor Petters Company, Inc.; "PGW" will signify Debtor Petters Group Worldwide, LLC. "Trustee's Omnibus Memorandum" will signify the Omnibus Memorandum of Law in Opposition to Defendants' Motions to Dismiss" [Dkt. No. 1158] that the Trustee filed to start the process of submissions for the "consolidated issues" process.

entitled to relief.'"[4] To meet this standard, and to pass muster in the face of a motion for dismissal under Fed.R.Civ.P. 12(b)(6),[5] "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 547, 127 S.Ct. 1955, 1960, 167 L.Ed.2d 929 (2007)).

A complaint's statement of a claim is plausible if its "factual content ... allows the court to draw the reasonable inference that the defendant is liable for the [conduct] alleged." *Iqbal,* 556 U.S. at 663, 129 S.Ct. at 1940. At the pleading stage, a plaintiff must set forth enough to show that success on the merits is more than a "sheer possibility." *Id.* The Plaintiff must "assert facts that affirmatively and plausibly suggest that it has the right [it] claims ... rather than facts that are merely consistent with such a right." *Stalley v. Catholic Health Initiatives,* 509 F.3d 517, 521 (8th Cir.2007) (citing *Twombly,* 550 U.S. at 554–557, 127 S.Ct. 1955, 1964–1966). A pleaded claim must be based on more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949 (quoting *Twombly,* 550 U.S. at 555, 127 S.Ct. at 1955).

The plausibility standard is not, however, a "probability requirement." *Id.* Thus, "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and 'that a recovery is very remote and unlikely.'" *Twombly,* 550 U.S. at 556, 127 S.Ct. at 1965 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). *See also Skinner v. Switzer,* —— U.S. ——, 131 S.Ct. 1289, 1296, 179 L.Ed.2d 233 (2011) (to comply with specificity requirements of Rule 8(a)(2), "a complaint need not pin [the] plaintiff's claim for relief to a precise legal theory"; the rule "requires only a plausible 'short and plain' statement of the plaintiff's claim, not an exposition of his legal argument").

In *Braden v. Wal–Mart Stores, Inc.,* 588 F.3d 585, 594 (8th Cir.2009), the Eighth Circuit outlined "[s]everal principles [to] guide [a court] in determining whether a complaint meets [the] standard" of *Iqbal* and *Twombly:*

1. The court must take the plaintiff's factual allegations as true. *Id.* (citing *Iqbal,* 556 U.S. at 678, 129 S.Ct. at 1949–1950).

2. However, no such deference need be given to legal conclusions or "formulaic recitation of the elements of a cause of action"; they may be set aside in the weighing of the complaint as a whole toward making out a claim on its merits under law. *Id.*

3. Some allegations nominally of fact may be so indeterminate that they require "further factual enhancement" in order to state a claim. *Twombly,* 550 U.S. at 557, 127 S.Ct. at 1966.

4. Finally, "the complaint should be read as a whole, not parsed piece by piece to determine whether each allegation, in isolation, is plausible." *Braden,* 588 F.3d at 594. The factual allegations should be "viewed in their totality." *Id.*

---

4. This rule is made applicable to adversary proceedings in bankruptcy cases by Fed. R. Bankr.P. 7008(a).

5. This rule contemplates dismissal of an action on motion, for its complaint's "failure to state a claim upon which relief can be granted." Rule 12(b)(6) is made applicable to adversary proceedings in bankruptcy cases by Fed. R. Bankr.P. 7012(b).

*See also Brown v. Medtronic, Inc.,* 628 F.3d 451, 459 (8th Cir.2010). As a judicial endeavor, then, the evaluation of a complaint's "plausibility" on a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal,* 556 U.S. at 679, 129 S.Ct. at 1950.

## B. Rule 9(b)

Fed.R.Civ.P. 9(b) provides that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." [6] Rule 9(b) requires plaintiffs "to plead the who, what, when, where, and how: the first paragraph of any newspaper story." *Freitas v. Wells Fargo Home Mtg., Inc.,* 703 F.3d 436, 439 (8th Cir.2013) (quoting *Summerhill v. Terminix, Inc.,* 637 F.3d 877, 880 (8th Cir. 2011)); *Crest Constr. II, Inc. v. Doe,* 660 F.3d 346, 353 (8th Cir.2011) (ditto). *See also S.E.C. v. Brown,* 643 F.Supp.2d 1077, 1086 (D.Minn.2009) (quoting *Tuttle v. Lorillard Tobacco Co.,* 118 F.Supp.2d 954, 963 (D.Minn.2000)). This requirement of particularity does not apply to allegations of "[m]alice, intent, knowledge, and other conditions of a person's mind," which "may be alleged generally." Fed.R.Civ.P. 9(b).

## ISSUE # 6: PLEADING AS TO THE PREDICATE CREDITOR. 11 U.S.C. § 544(b) and Minn.Stat. § 541.05, Subd. 1(6): Identification of the Predicate Creditor and Basis for Discovery Allowance.

The first memorandum established one major principle for this litigation: the predicate creditor—the person or entity that furnishes the trustee's standing under 11 U.S.C. § 544(b) to sue under the state law of fraudulent transfer [7]—is the party that furnishes the vantage point from which the bankruptcy estates' posture in the litigation and the factual and legal merits of their avoidance claims are to be measured. First Memorandum [Dkt. No. 1951], 40–43.[8]

■ Beyond the operation of the discovery allowance, the existence of a predicate creditor and its position at the relevant date will determine whether a trustee even has the right to avoid a particular transfer:

> To exercise her § 544(b)(1) avoidance power, the trustee must show that the transfer is voidable under state law by at least one unsecured creditor of the bankruptcy estate with an allowable claim.

*In re Marlar,* 267 F.3d 749, 753 (8th Cir. 2001). *See also In re Mirant Corp.,* 675 F.3d 530, 534 (5th Cir.2012). A trustee may invoke the standing of "any unsecured creditor [that] has the right to [avoid the transfer] under state law." *Id.* at 754 (emphasis in original). However, it must be "an actual unsecured creditor [of the debtor in the case,] holding an allowable unsecured claim." *In re Wintz Cos.,* 230 B.R. 848, 859 (8th Cir. BAP 1999) (quoting *Sender v. Simon,* 84 F.3d 1299, 1304 (10th Cir.1996) (interior quotes and citation

---

**6.** This rule is made applicable to adversary proceedings in bankruptcy cases by Fed. R. Bankr.P. 7009.

**7.** Section 544(b) empowers a trustee to "avoid any transfer of an interest of the debtor in property ... that is voidable under applicable law by a creditor holding an unsecured claim that is allowable" in a bankruptcy case under 11 U.S.C. § 502.

**8.** On the issue presented there, it was held that the predicate creditor is the "aggrieved party" for the determination of whether the discovery allowance of Minn.Stat. § 541.05, Subd. 1(6) eases the effect of that statute's six-year limitations period in a bankruptcy case. First Memorandum [Dkt. No.1951], 42.

omitted)). *See also Stalnaker v. DLC, Ltd.*, 376 F.3d 819, 823 (8th Cir.2004), *aff'd In re DLC, Ltd.*, 295 B.R. 593, 601–602 (8th Cir. BAP 2003).

On those substantive fundaments, the defense raises two pleading-related issues on the motions for dismissal.

### A. Pleading the Identity of the Predicate Creditor.

 Across his avoidance litigation, the Trustee pled the following as to the predicate creditor:

> At all times material hereto, there was and is at least one or more creditors who held and who hold unsecured claims against the Debtor that was and is allowable under Bankruptcy Code § 502 or that was and is not allowable only under Bankruptcy Code § 502(e). The Transfers are avoidable under applicable nonbankruptcy law by a creditor holding an unsecured claim in the bankruptcy case.

Complaint in *Kelley v. Alper*, ADV 10–4293 [Dkt. No. 1], 12.[9]

The defense argues that dismissal is appropriate because this passage does not plead the existence and identity of a specific creditor that could have sued on the relevant date to avoid the challenged payments from the Debtors.[10] They characterize the Trustee's wording as impermissibly abstract, a "naked assertion" that only summarizes the nature of a statutory element. Their point is that a bland statement in the passive voice that there existed *a* creditor that met the statutory requirement, without either naming it or describing it by specific characteristics, cannot pass muster under either the plausibility standard or the more general observations of *Twombly* and *Iqbal*.

The defense cites several on-point published decisions: *In re Sverica Acquisition Corp., Inc.*, 179 B.R. 457, 465 (Bankr. E.D.Pa.1995) (such pleading "fails to adequately place Defendants on notice of whose rights the Trustee is claiming under"); *Neilson v. Union Bank of Cal., N.A.*, 290 F.Supp.2d 1101, 1146–1148 (C.D.Cal.2003). These decisions pre-date the issuance of *Twombly* and *Iqbal*. However, the defense argues that they are more aligned with the post-*Twombly* standard for plausibility and specificity, than the on-point decisions that the Trustee cites.[11]

For his part, the Trustee relies principally on two decisions from the bankruptcy forum in the Southern District of New York. They include one out of the case commenced in the wake of the failure of Bernard Madoff's Ponzi scheme: *In re Bernard L. Madoff Inv. Secs. LLC*, 445 B.R. 206 (Bankr.S.D.N.Y.2011) ("*Madoff/Chais*"); and *In re Musicland Holding Corp.*, 398 B.R. 761, 781 n. 13 (Bankr.

---

9. Throughout his omnibus memorandum, the Trustee used this complaint as one of three exemplars to respond to the defense's challenges to the content of his pleading. It is attached to the Trustee's Omnibus Memorandum [Dkt. No. 1158] as Illustrative Compl. 1 [CM/ECF pp. 180–203]. The defense does not challenge the representative quality of any of the three exemplars.

10. That date was the date on which the bankruptcy petition was filed for the particular

Debtor out of whose case the Trustee is suing a particular defendant. First Memorandum [Dkt. No.1951], 37–38.

11. All of the decisions cited by both sides are from the trial court level-needless to say. These specific controversies have not made it up to an appellate court since *Twombly* and *Iqbal;* or even before then, it seems.

S.D.N.Y.2008).[12] The Trustee points out that these rulings were issued after *Twombly* and *Iqbal*, in cases with factual and procedural contexts very similar to those at bar. With that origin, he maintains, these decisions show that the plausibility standard does not require the disclosure of a predicate creditor by name (or even class) at the pleading stage in a trustee's fraudulent transfer litigation. He rejects a requirement of specific disclosure as an inappropriately "heightened" pleading standard, more stringent than *Twombly* and *Iqbal* would require.

These arrayed positions reflect a split in the case law on the issue at bar. The split was present before *Twombly* and *Iqbal* were issued. It has persisted since. In addressing it, it is important to note that some of the courts made their rulings more in consideration of the substantive burden of proof on the merits that a trustee bears as to the predicate creditor, in the context of a motion for summary judgment. Others ruled at the early stage of pleading, with its own frame of reference. Still others have melded, commingled, or confused the different alignments of these distinct stages.

But first things first, as to case law authority from the local appellate forums.

The opinion of the Bankruptcy Appellate Panel for the Eighth Circuit in *In re Wintz Cos.* came out of an appeal from a grant of summary judgment in favor of a trustee. In opposing the Trustee's motion, the defendants had argued in passing that the trustee had not established his standing to sue using Minnesota fraudulent transfer law.[13] They had challenged the trustee's showing under Rule 56, on the ground that he had not identified a predicate creditor by name in his evidentiary submissions for his motion. They also pointed out that the trustee had never even stated, anywhere in the litigation, that such a creditor had existed and could have sued on the relevant date.

The defendants in *Wintz Cos.* were correct on that point; the trustee's complaint had not even addressed his standing as a matter of fact or law.[14] Hence, the panel's broad impugnment of the trustee's proof *and* pleading:

Thus far, the Trustee has not only failed to identify such a creditor, but has failed even *to allege* that such a creditor exists,

**12.** The Trustee also cites several decisions from that and other districts, which reach the same conclusion but without as much verbiage in the discussion: *In re James River Coal Co.*, 360 B.R. 139, 168 (Bankr.E.D.Va. 2007); *In re Lexington Healthcare Group, Inc.*, 339 B.R. 570, 576 (Bankr.D.Del.2006); *In re Healthco Int'l, Inc.*, 195 B.R. 971, 980 (Bankr. D.Mass.1996); *In re RCM Global Long Term Capital Appreciation Fund, Ltd.*, 200 B.R. 514, 523–524 (Bankr.S.D.N.Y.1996). These extra decisions predate the issuance of *Twombly* and *Iqbal*.

**13.** The B.A.P. stated it was addressing the matter *sua sponte*. 230 B.R. at 858. The issue had been raised briefly in oral argument at the trial-court level. Perhaps it was not designated as such for appeal.

**14.** A review of the complaint in *Ries v. Wintz Properties, Inc., et al.*, shows this. None of the text in the fraudulent-transfer counts has any fact pleading on the predicate creditor. The complaint does not mention the concept at all. The averments as to the availability of the remedy under state law are oblique and quite conclusory; they modify their identification of the particular transfers solely with the phrase "... which is avoidable by the Trustee pursuant to ... § 544(b)." Complaint, ADV 98–3086 [Dkt. No. 1], ¶¶ 73, 79, 86, 92, 96, 102, 105, 110. Unfortunately, such sloppiness is not uncommon in the litigation of busy panel trustees. Where an issue is rarely raised by challenge from defendants, it tends to get lost at the opening stages.

as he is required to do in order to meet this threshold burden.

230 B.R. at 859 (emphasis added).

Because *Wintz Cos.* came out of a grant of summary judgment, the panel's reference to an "allegation" by the trustee is dictum, to the extent it is read to apply to pleading and even though it (correctly) points out a flaw in that trustee's original pleading. However, such a prominent mention was well-put. It has real significance for the issue at bar.

More to the point of arguments actually made here, *Wintz Cos.* does not stand for the proposition for which the Trustee cites it, "that the Trustee need only to allege the existence of a creditor in his pleading." The trustee in *Wintz Cos.* had not done even that little. As a result, the record there did not implicate a choice between generalities and specifics *in pleading.* The B.A.P. certainly was not giving its imprimatur to a generality-structured content of pleading. If anything, its rumination on a "threshold burden" drives in the other direction.

One other preliminary matter is prompted by the Trustee's heavy reliance on case law from the Bankruptcy Court for the Southern District of New York and other jurisdictions that follow its broad and lenient pronouncements. Both *Madoff/Chais* and *Musicland* refer to Rule 8 as the guidance for standards in pleading. However, neither decision mentions *Twombly, Iqbal,* or a standard that is articulated in terms of plausibility. *Madoff/Chais* cites back to *Musicland.*

*Musicland* in turn uses the traditionalist resort to "liberal" pleading standards oriented around a broad notion of "fair notice" as the threshold, a line of authority that began with *Conley v. Gibson,* 355 U.S. 41, 47, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957).[15]

However, *Twombly* resoundingly abrogated *Conley's* "no set of facts" escapehatch for pleading plaintiffs. 550 U.S. at 561, 127 S.Ct. 1955.[16] *Twombly* did so on the ground that, otherwise and under what *Conley* had become in operation, "a wholly conclusory statement of claim would survive a motion to dismiss whenever the pleadings left open the *possibility* that a plaintiff might *later* establish some 'set of [hitherto-undisclosed] facts' to support recovery." *Id.* (emphasis added). Thus, through *Twombly* and *Iqbal* the Supreme Court announced that the syntactical construct of "no set of facts" "ha[d] earned its retirement." *Twombly,* 550 U.S. at 563, 127 S.Ct. 1955. To take its place, the Supreme Court articulated the new "plausibility" standard for pleading.

*Twombly, Iqbal,* and their new standard have received an astounding amount of comment, debate, conjecture, speculation, and befuddlement from academia and the practicing bar alike. The lower courts have wrestled to divine just what is different now. At this date it is clear enough that *Twombly* and *Iqbal* require a more pointed recitation of specific facts that fit together as a matter of historical occurrence and logic to establish the elements on which to grant relief under the law invoked for suit. This is the gist of what

---

**15.** *Musicland* specifically cites *Conley v. Gibson.*

**16.** For 60 years, *Conley* was cited repeatedly for its "accepted rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45–46, 78 S.Ct. 99.

the Eighth Circuit says in Braden, construing the two Supreme Court opinions.

The analysis in *Madoff/Chais* and *Musicland* does not even recognize the issuance of *Twombly* and *Iqbal*. In its assumed deference to broader and less-specific pleading, the substratum of *Madoff/Chais* and *Musicland* is no longer good law. Thus the Trustee's heavy reliance on *Madoff/Chais* and *Musicland* is quite tipsy.[17]

To contrary effect, *Twombly* and *Iqbal* must be applied directly to the issue at bar, without layering over any "policy considerations" that are context-specific to bankruptcy. The new "plausibility" considerations go to any aggregation of facts that is relevant to any claim in any suit. Here, that goes to as much to the facts material to the Trustee's derivative standing as it does to the factual requisites for avoidance on the merits.

To cut to the chase, then: the Trustee's generalized statement that "there was and is at least one or more creditors" within the contemplation of § 544(b), does not meet muster under Rule 8(a), in the wake of *Twombly* and *Iqbal*. It is not enough to merely state that there "was or is" *some* creditor out there, who could have sued a particular defendant on the relevant date to set aside a transfer of money to it from one of the Debtors. The particular defendant could not determine from such a vague statement whether it was properly subject to suit in the first place, at the instance of the Trustee.[18] All it really has is the nominal plaintiff's conclusory assertion, that he has the right to sue. Under a correct reading of the law, that right to sue turns on extrinsic facts that go beyond the trustee's nominal status as steward of the estate. Those facts are immured in the situation of a third party, the predicate creditor, as it stood at a particular point in time.[19]

It goes beyond saying, that it is not to be taken for granted that such a creditor

---

17. As an aside: The Trustee also relies on a summary pronouncement from 5 *Collier on Bankruptcy* ¶ 544.06[1] at 544–19 (16th ed. 2010). This treatise and the benches in some districts sometimes cite each other for propositions in circular fashion—without ever getting down to the statute and the rules themselves, as the logical source of legal governance. (This pattern has been noted earlier in this project. First Memorandum [Dkt. No.1951], 36 n. 40.) That old song line pops to mind: "... and the music goes 'round and 'round, ooooh, ooooh ... o-ooh, and it comes out here."

18. This would not be quite as large an issue outside the context of bankruptcy; the predicate creditor often would be the named plaintiff. In bankruptcy, though, it is a real concern because the trustee derives standing and can compel suit from the standpoint of someone else, a particular creditor and claimant against the estate. The Bankruptcy Code's use of derivative standing means that the predicate creditor is not an active participant in the litigation; but the trustee still has to prove up the facts that go to the predicate creditor's right of suit outside of bankruptcy in order to go forward, and to recover. level on the assumption that all of the complaint's allegations are true.

19. First Memorandum [Dkt. No.1951], 37. The characteristics of that third party's situation are fixed by the Bankruptcy Code:

> A "creditor" is "an entity that has a claim against the debtor that arose at the time of or before the order for relief against the debtor." 11 U.S.C. § 101(10)(A). The referent creditor here must have a claim "allowable" in the bankruptcy case. This means, first, that the creditor must have had a "right to payment" from the debtor. 11 U.S.C. § 101(5)(A) (definition of "claim"). In turn, that "claim" may be "allowed" for the purposes of the bankruptcy case and the administration of the estate, as it stood in validity and amount under nonbankruptcy law *"as of the date of filing of the bankruptcy petition."* 11 U.S.C. § 502(b) (preamble) (emphasis added).

exists. (The trustee in *Wintz Cos.* did that to his detriment.) And,

> ... a formulaic recitation of a cause of action's elements will not do. Factual allegations must be enough to raise a right to relief above the speculative

*Twombly*, 550 U.S. at 545, 127 S.Ct. 1955. It is not to be taken on a trustee's bare assertion that a predicate creditor is out there somewhere.[20]

As the defense points out, this is not just an abstract concern. Specific, fact-based avenues of defense turn on the identity of the predicate creditor and the nature of its past dealings with the relevant debtor. *Neilson v. Union Bank of Cal.*, 290 F.Supp.2d at 1148. In the matter at bar, that is clear for at least two different reasons.

At a more basic level, "[i]f the creditor is estopped or barred from recovery for some ... reason, so is the trustee." *In re Marlar*, 252 B.R. 743, 754 (8th Cir. BAP 2000), *aff'd*, 267 F.3d 749. This potential bar has two levels: the qualification of the predicate entity as a creditor in bankruptcy and hence as the predicate creditor; and those substantive aspects of the theory of avoidance that are specific to the predicate creditor itself. To defend early on the issue of standing or even on the merits, defendants have a right to notice via pleading, of the identity of the predicate creditor.

The other, more obvious one is the possibility and the reach of the discovery allowance of Minn.Stat. § 541.05, Subd. 1(6). For the purposes of its statute of limitations, that statute defers the accrual of claims under MUFTA "until the discovery by the aggrieved party of the facts constituting the fraud." The easing of the limitations period by a discovery allowance will delimit the exposure of those defendants that have been sued on transfers that took place outside (before) the six-year base limitations period. First Memorandum [Dkt. No. 1951], 10.

For this litigation, the aggrieved party is the predicate creditor. First Memorandum [Dkt. No. 1951], 39–43. Thus, the actual knowledge of facts and circumstances held by the specific predicate creditor will be the key to whether the discovery allowance operates in any particular adversary proceeding in this docket. First Memorandum [Dkt. No. 1951], 42–43. To structure and pursue their opposition to a discovery allowance, defendants are entitled to know the identity of the predicate creditor. Since that point of fact goes to a trustee's fundamental standing to sue, it belongs in the complaint, as a part of a pleading of facts that make out a " 'showing,' rather than a blanket assertion, of entitlement to relief." *Twombly*, 550 U.S. at 556 n. 3, 127 S.Ct. 1955.[21]

■ So, **Ruling # 6A:** To plead his standing to sue to set aside a transfer to

---

*Id.*

**20.** Certain of the defendants in this docket dispute that very point, as to particular entities among the group of debtors in these cases.

**21.** But, a trustee is not limited to one predicate entity, in pleading on the issue of standing. Only one entity need be qualified for standing to inure to the trustee; but there is nothing to prevent the trustee from naming

more than one entity or group as a hedge. *See U.S. Bank Nat'l Ass'n v. Verizon Commc'ns Inc.*, 479 B.R. 405, 410–413 (N.D.Tex.2012) (analyzing three different groups proffered by trustee as predicate creditors; disqualifying two; but holding that trustee had standing based on status of single judgment creditor whose claim had been satisfied during pendency of case).

any defendant as fraudulent under Minnesota law, the Trustee must identify by name, in his complaint, at least one unsecured creditor with a claim allowable against the estate whose standing he uses to sue that defendant, which creditor would have had the right to sue to avoid that transfer on the date that that Debtor filed for bankruptcy relief. The Trustee's generic pleading as to the existence of a predicate creditor does not satisfy Rule 8(a). To maintain his claims against the defendants beyond the stage of these motions, he must remedy this defect.

### B. Pleading Facts Going to the Discovery Allowance.

The discovery allowance of Minn.Stat. § 541.05, Subd. 1(6) is a key part of the Trustee's strategy to remediate the failure of the Petters Ponzi scheme. The extent to which the discovery allowance will enable a reachback in time for the estate's avoidance powers will drive many crucial aspects of the Trustee's administration: which transfers to which defendants may be subjected to the avoidance remedies; whether particular defendants (i.e., those sued only on transfers made before the six-year base limitations period) are even subject to suit; and the outside limits of the estates' aggregate recovery from this litigation docket. First Memorandum [Dkt. No. 1951], 10.

Taking the more immediate of those aspects to heart, many defendants moved for dismissal in whole or in part on the ground that the Trustee did not plead facts that would give the estates the benefit of any discovery allowance.

The fact pleading thus impugned is typified by the following passages from one of the Trustee's exemplar complaints.

31. [Tom] Petters, as the owner, officer, and director of PCI, PGW and other debtor entities, was a fiduciary of these entities and had a duty to disclose the fraudulent activities alleged in this Complaint. Petters, in violation of his fiduciary duty, did not disclose the fraudulent activities to current or prospective investors and other creditors of PCI, PGW, and other debtor entities.

32. [Tom] Petters, or Petters and his Associates, fraudulently and intentionally concealed the ongoing fraud in an effort to hinder and delay authorities and other current and prospective investors and other creditors of PCI, PGW, and other debtor entities from discovering the fraud.

33. The concealment of the fraud, whether by Petters' silence, the fraudulent and intentional concealment of the facts constituting the fraud, and/or the adverse domination of PCI, PGW, and other debtor entities by Petters or Petters and his Associates, prevented the discovery of the on-going fraud until the Receiver was appointed and placed in control of the entities and the Receiver/Trustee was able to discover facts constituting the fraud alleged in this Complaint.

Complaint, *Kelley v. Alper*, ADV 10–4293 [Dkt. No. 1], 8.

The content of this passage is framed by an understanding that *the Trustee* was the party through whom the availability and consequences of the discovery allowance would be determined. The Trustee initially structured his arguments on that foundation, but he forsook it while these mo-

tions for dismissal were pending. He (correctly) shifted the identity of the statutory "aggrieved party" to the predicate creditor from which he would take standing. First Memorandum [Dkt. No. 1951], 37–38 and 41–43.[22]

This switch in theory makes the Trustee's original pleading inadequate, per se. The reality of a discovery allowance is no longer to be gauged against the arrival of an empowered, but previously disconnected, third party (a receiver or trustee). As to such a late-arriving third party, only the pretense that was projected *outward* from the Petters organization during the scheme's operation could possibly bear on the issue of notice and the possible discovery of the underlying fraud.

With the discovery allowance now to be gauged as to a specific, real creditor that was actually engaged with the Petters operation, the projected pretense is only part of the relevant facts. The recipient of the projection (the predicate creditor) had its own eyes, ears, and brain. For a bankruptcy case, the way those worked during the time of that engagement, up through the bankruptcy filings, is the predominant consideration under the discovery allowance as Minnesota law frames it.[23] The questions have become, did the actual predicate creditor know any of the de facto circumstances within the Petters operation; if so, what; and if not, was it actually aware of anything extrinsic that would cause a reasonable person to suspect that its borrower was engaged in wrongful conduct that would implicate the use of fraudulent-transfer remedies in favor of ongoing creditors?

Practically speaking, the point in time relevant to this inquiry will not be the date(s) on which the predicate creditor lent to a Debtor. It is unlikely that the Trustee would choose a predicate creditor that could be accused of complicity with the scheme, actively or passively, thereby subjecting fraudulent-transfer claims to a defense of estoppel or in pari delicto.

■ Rather, the relevant time is after that—*after* the predicate entity did something to make it a creditor. As to a predicate creditor chosen for its non-complicity, the discovery allowance would center on when, if ever, it learned a critical mass of facts evidencing a long-term Ponzi scheme, or something powerfully suggesting a more general fraud on lenders. This would be the actual knowledge or deemed notice that equates to the "discovery" for the allowance. Once the predicate credi-

---

**22.** In a variant position aired at oral argument, the Trustee also suggested that the discovery allowance was properly triggered as of the date on which the last single victim-creditor "invested in" the Ponzi scheme, i.e., lent into it, because that was the earliest that a creditor could have or should be deemed to have known of the possibility of fraud. For this approach, he relied on *In re Maui Indus. Loan & Fin. Co.*, 463 B.R. 499, 500 (Bankr. D.Haw.2011). The articulations of the two positions are not inconsistent; they could coincide perfectly if the Trustee were to name that last such lender as his predicate creditor.

**23.** The question of "what constitutes a 'discovery' within the meaning of the statute" of limitations, in application to a fraudulent conveyance action, was first treated under the predecessors to the current Minnesota statutes over a century ago:

> [T]he means of discovery are equivalent to actual discovery, and ... a party must be deemed to have discovered the fraud when, in the exercise of proper diligence, he could and ought to have discovered it.

*Duxbury v. Boice*, 70 Minn. 113, 120, 72 N.W. 838, 839–840 (1897) (Wm. Mitchell, J.). This is still the rule in Minnesota. *E.g., Estate of Jones v. Kvamme*, 449 N.W.2d 428, 432 (Minn.1989).

tor gained actual knowledge or deemed notice, its right to sue in avoidance would accrue and it would have six years going forward to commence suit. The discovery allowance then would permit it to sue all recipients of earlier fraudulent transfers, whenever they had taken place. Its onus only would be to commence such suit within six years of its discovery of the fraud, whenever that occurred.

■ For the Trustee's derivative standing, the date of the relevant Debtor's bankruptcy filing is the point as of which the discovery allowance is fixed. If the predicate creditor had no actual knowledge or notice before that date, it would have been free to sue on that date on all past transfers regardless of when they occurred.[24] Thus, so would the Trustee, his derivative standing vested as of then but within the other confines of bankruptcy law.[25] Even if the predicate creditor had direct knowledge or deemed notice before the filing date, it could assert the discovery allowance on that date as to all such transfers, as long as it had first gained such knowledge or notice within the six years before the bankruptcy filing. The Trustee, then, would have the same relief from the statute of limitations, again locked in as of the date of the bankruptcy filing, and again subject to his own deadline of suit under bankruptcy law.

In either case, then the Trustee would properly have sued as to all such transfers going back, without regard to the six-year base period, and could now maintain suit.

For any defendant that is being sued on payments to it received before the six-year base period dating back from the bankruptcy filings, the state of the predicate creditor's knowledge and notice during that same six years is crucial. A trustee should not premise his standing on a particular predicate creditor in order to sue an earlier-paid creditor, unless he knows that the predicate creditor was ignorant enough of the reality at all times relevant to a discovery allowance within the bankruptcy context. If the Trustee here cannot show that his predicate creditor was so unwitting, then he is not entitled to have the discovery allowance ease the period of limitations.

For the Minnesota law of limitations and fraud actions, the discovery of fraud and the reasonable prospect of such discovery are questions of fact. *Barry v. Barry,* 78 F.3d 375, 380 (8th Cir.1996); *Estate of Jones v. Kvamme,* 449 N.W.2d at 432; *Murphy v. Country House, Inc.,* 307 Minn. 344, 351, 240 N.W.2d 507, 512 (1976). The Trustee argues that as such, no issue over the discovery allowance and its components should be broached in an early motion for dismissal. This argument is inapposite.

If anything, the allowance's dependence on the existence of specific facts subjects this topic to the pleading rules' rigor, more firmly than before. *Twombly* and *Iqbal* cement that conclusion to the outcome that Minnesota law would dictate anyway:

> . . . in an action for fraud brought more than 6 years after the fraudulent acts relied upon, the plaintiff *must allege in his complaint* that he did not discover

---

**24.** This second-level hypothetical assumes that the predicate creditor gained actual knowledge or notice *as of* that date. If it had not, the limitations period would continue to be in stasis as a matter of nonbankruptcy law—though the Trustee would be subject to the deadline for commencement of suit dictated by bankruptcy law.

**25.** The reference here is to the two-year deadline of 11 U.S.C. § 546(a)(1)(A). First Memorandum [Dkt. No.1951], 31–38.

fraud until within 6 years before commencement of the action. . . . In other words, [the] plaintiff *must*, in claiming the benefit of the provision suspending the running of the statute of limitations until the discovery of the fraud, *affirmatively set forth in his complaint the facts relating to this discovery.*

*Kelly v. Kelly*, 304 Minn. 237, 229 N.W.2d 526, 530 (1975) (emphasis added and citations omitted). In the sensibility of the Eighth Circuit's prescription for Rule 9(b), the "who, what, when" would include: was the predicate creditor aware of anything relating to the Petters operation that suggested that Tom Petters was not engaged in a bona fide business operation of the sort he projected? Was there anything in the predicate creditor's relationship or transacting with the relevant Debtor that would have reasonably enabled it to learn anything of the truth? And if not, why not? [26]

With the Trustee now seeking the benefit of the discovery allowance by relying on a predicate creditor's inability to discover the Ponzi scheme, he is obligated to plead more facts going to *that entity's* entitlement to the allowance. Particularly with the change of theory, defendants cannot formulate and develop their defense under the statute of limitations on the former state of the Trustee's pleading.

■ Therefore, *Ruling # 6B:* To the extent that the Trustee seeks to have the statute of limitations of Minn.Stat. § 541.05, Subd. 1(6) eased by the application of the discovery allowance, he must plead that his predicate creditor did not know of or discover the fraud of the Pet-

ters Ponzi scheme, at any time until within the six years before the date on which the bankruptcy petition was filed for the relevant Debtor. He must also plead the specific facts that prevented the predicate creditor from obtaining such knowledge and from discovering the fraud. The defects in the Trustee's original pleading must be remedied, at the appropriate time.

## ISSUE # 7: PLEADING THE TRANSFER AND THE FRAUD OF A FRAUDULENT TRANSFER. Fed. R.Civ.P. 8 and 9.

As noted previously, the Trustee relies on the federal and state law of fraudulent transfer—the Bankruptcy Code's provision at 11 U.S.C. § 548(a) and MUFTA—as the primary substantive basis for a recapture of funds paid to the defendants during the time that Tom Petters purveyed his scheme through the Debtors. Almost all of the moving defendants take issue with the way the Trustee pleaded his avoidance claims under these statutes. They insist that his complaints did not give them appropriate notice of the underlying factual basis and hence are fatally defective. They attack various aspects of his asserted case.

### A. Pleading the Transfers.

■ The defense first takes on the Trustee's pleading at the target-point of the relief he seeks, the transfers of funds that the Trustee would have undone via avoidance. Many of the defendants who raise this argument are parties that provided funding to Tom Petters via individually-documented loans to ostensibly finance

---

**26.** This third question is not posed in an accusatory tone. It is directed toward the circumstances that would bolster a discovery allowance.

the main business of the Petters organization, "diverting." [27] A fair number of these defendants consummated multiple loans to PCI or one of its Debtor-subsidiaries, each one specific to one ostensible diverting transaction. Many of these lending relationships went on over several years.

The theory of this attack is that the Trustee's template does not tie the subject payments (which are identified by date and amount) back to corresponding "note transactions"—i.e., the individually-documented lendings for particular ostensible "diverting" transactions. This, the defense says, prevents any party from determining how any given transfer relates to the Trustee's theory of fraudulence.

Defendant Edgebrook, Inc. is among the proponents of this challenge. The Trustee's complaint against it [ADV. 10–4204, Dkt. No. 1 ("Edgebrook Complaint")] provides an example to vet the argument. The Trustee alleges that Edgebrook engaged in "at least 60" note transactions with or through PCI, for a total lending of $4,050,000.00. Edgebrook Complaint, ¶ 30. The Trustee states that the underlying notes provided for interest rates of 12% to 90%, Edgebrook Complaint, ¶ 39; that PCI transferred a total of $5,881,200.00 to Edgebrook, Edgebrook Complaint, ¶ 43; and that as a result Edgebrook received a total of $1,831,200.00 in "false profits"

through its lending to or through PCI, Edgebrook Complaint, ¶ 44.[28]

The Trustee used this format as a template for his complaints against all of the defendants who had been lender-"investors" with the Petters organization. Edgebrook contends that this lacks factual detail as to where and how an act of fraud was committed through any lending transaction, or any transfer back. Specifically, Edgebrook takes the Trustee's pleading to task for not itemizing the initial lending transactions, or linking such to the payments that are itemized in the exhibit. It would also have the Trustee required to itemize each *lending* by date of note, the associated interest rate, and the date and means of transfer in payment on each note. Finally, as Edgebrook would have it, the Trustee never really pleads how any particular transfer made to it was fraudulent in any way, in itself.

None of Edgebrook's demanded fact content is necessary to plead a plausible case for fraudulent transfer, or (in particular) to describe transfers that had a fraudulent character when and as made. For this issue, context is everything; and that *everything* overwhelms Edgebrook's objections.

The Trustee's template includes a lengthy description of a long-term Ponzi scheme, and the central role of lending

---

**27.** At the distribution level of the consumer goods sector of the economy, "diverting" is the activity of finding overstock inventory of merchandise that is not being sold by its current owner, and locating a buyer for it. The "diverter" makes its money on the difference between the amount paid to the overstocked seller and the amount paid by the buyer in need. The activity definitely has a function. However, in a fast-moving retail economy large lots of consumer goods often languish in inventory for a reason—so engaging in diverting has its risks and its limita-

tions. *See In re Polaroid Corp.,* 472 B.R. 22, 36–37 (Bankr.D.Minn.2012).

**28.** "False profits" is the term that the Trustee uses to denote amounts repaid to lender—"investors" in the Petters enterprise, that were in excess of the amount of principal originally lent. The whole concept of "false profits" is a matter of separate controversy for the defense. At least one aspect of it will be treated in the third memorandum.

such as Edgebrook's in its maintenance.[29] The statements of fact in the Edgebrook Complaint place the Edgebrook transactions in the thick of the scheme's duration. When every identified transfer back to Edgebrook is viewed against that looming backdrop, the complaint recites sufficient facts to make out a plausible act of fraud by a Debtor, as to that transfer. *See United States v. Bame*, 778 F.Supp.2d 988, 992 (D.Minn.2011) ("By 'specifying the dates and nature of the transactions' [i.e., transfers] in question, as well as pleading several indicia of fraud, the [plaintiff] has done all that was required here." (citations omitted)).[30] As in *Bame*, the other factual detail of the complaint adequately describes an edifice of fraud, and then states that the subject transfers went through it. The Trustee's pre-suit obligation of inquiry, Fed. R. Bankr.P. 9011(b), required him to generate a minimum evidentiary basis for tying the transfers in repayment back to the lending that, he alleges, enabled the maintenance of the Ponzi scheme.[31]

The details of the tie-back are a subject for the discovery process. It was not necessary for the Trustee to plead this additional factual matter to make out a plausible link between the payments to Edgebrook and multiple acts of fraud.

Thus, *Ruling # 7A:* The Trustee's template pleading to identify the transfers that he would have avoided plausibly links them to the alleged acts of fraud on the Debtors' part, as contemplated by the substantive law of fraudulent transfer.

## B. Pleading Actually–Fraudulent Transfers.

The Trustee relies on substantive state and federal law. Both provide for the avoidance of transfers made by a debtor

---

**29.** Over the duration of these cases, the Trustee's recitation of this historical subject matter in motion and pleading has grown in length, complexity, and density. Some of the defendants tag this template with the lawyer's epithet "boilerplate." A number have complained of a burden resulting from its presence. Yes, the text's statements have become rote. It is tempting to gloss over its many pages, wherever they appear. However, the Trustee's refinement and use of this text is only prudent. Those who have lived with these cases now know the story in appropriate degrees, the presiding judge as well the Trustee and his lawyers. Many defendants have not had that intense interface with the history, however. And, it is likely that this will not be the only court to address these issues. So whether its utility is for the adequacy of notice pleading or for broader orientation, the backdrop belongs in the Trustee's complaints. It is a necessary part of the Trustee's record.

**30.** In concluding that the complaint passed muster as to the place of the transfers in the fraudulent scheme before it, the *Bame* court relied in part on the complaint's conformity with the form for a fraudulent transfer complaint that is found in the Appendix of Forms to the Federal Rules of Civil Procedure, Form 21. (The Appendix of Forms is given official sanction by Fed.R.Civ.P. 84: "The forms in the Appendix suffice under these rules and illustrate the simplicity and brevity that these rules contemplate.") The *Bame* court acknowledged that the form complaint was comprised of "somewhat bare-bones assertions"; but nonetheless it held that using it with adaption to specific facts was enough to satisfy Rule 8 and 9–even in light of the prescriptions of *Twombly* and *Iqbal*. 778 F.Supp.2d at 990–991.

**31.** The enabling, of course, would have occurred when the funding from the loans was immediately directed to repay earlier lender-investors, rather than to purchase goods for ostensible "diversion" as represented to Edgebrook. This clandestine flow and redirection of capital infusions is the essence of a Ponzi scheme. *E.g., In re Armstrong*, 285 F.3d 1092, 1093 n. 3 (8th Cir.2002); *In re Agric. Research and Tech. Group, Inc.*, 916 F.2d 528, 531 (9th Cir.1990).

with intent to hinder, delay, or defraud creditors. Minn.Stat. § 513.44(a)(1); 11 U.S.C. § 548(a)(1)(A).[32] Numerous defendants argue that the Trustee's pleading does not recite sufficient facts to make out a plausible case for such intent, on the part of the Debtor that made payment to them.

The Trustee relies on two different means to prove actual fraudulent intent. One is context-specific and one is general.

### 1. The Ponzi Scheme Presumption.

As his primary means, the Trustee invoked a presumption of intent that has been judicially recognized for several decades. It applies to cases where fraudulent transfer remedies are brought to bear in remediation of a failed Ponzi scheme. When the defense's motions were first filed, they challenged the Trustee's reliance on the presumption in two ways: the availability of the presumption as law in this jurisdiction, and the content of the Trustee's pleading that went to its application on the specific facts of their relationship with the Debtors.

### a. Merits of Presumption and Propriety of Recognizing It.

The Ponzi scheme presumption requires proof of two basic facts: the existence and operation of a Ponzi scheme using the debtor-entity that is under the jurisdiction of the court; and a transfer of property by the debtor-entity to another party, made in furtherance of the scheme. The establishment of these basic facts enables the finding as to the ultimate fact, without need of further proof. The ultimate fact, of course, is that the debtor-entity or the persons in control of it who directed the transfer, made the transfer with intent to hinder, delay, or defraud the creditors of the debtor-entity. *E.g., Wing v. Dockstader,* 482 Fed.Appx. 361 (10th Cir.2012); *Perkins v. Haines,* 661 F.3d 623 (11th Cir.2011); *Donell v. Kowell,* 533 F.3d 762 (9th Cir.2008); *Warfield v. Byron,* 436 F.3d 551 (5th Cir.2006).[33]

When the Trustee filed the complaints in this docket, and at the time the moving defendants filed their motions for dismissal, the Ponzi scheme presumption was a stranger to the body of law that a bankruptcy judge in this district was required to consider or bound to apply. No appellate court in the Minnesota state system had entertained or recognized the presumption. Neither had the United States District Court for this district or the

---

**32.** The Minnesota statute requires "actual intent to hinder, delay, or defraud any creditor of the debtor"; the Bankruptcy Code's provision requires "actual intent to hinder, delay, or defraud any entity to which the debtor was, or became, on or after the date that such transfer was made ... indebted." The Eighth Circuit has held that the commonality of language enables the federal courts to give the federal statutory provision the same construction as state law. *In re Craig,* 144 F.3d 587, 593 (8th Cir.1998). The Eighth Circuit also appears to favor harmonizing the federal courts' construction of state fraudulent transfer law with existing construction of corollary federal law—at least absent a contrary construction from the state courts. *In re Graven,* 936 F.2d 378, 383 (8th Cir.1991) (Uniform Fraudulent Conveyance Act and § 548(a)(1) use "the same standard"); *In re Graven,* 64 F.3d 453 (8th Cir.1995); *In re Sherman,* 67 F.3d 1348, 1353 (8th Cir.1995).

**33.** These decisions were rendered by the four circuits that have recognized the Ponzi scheme presumption, as of the date of this memorandum. The presumption has been recognized and applied by many courts at the trial level. *See* Kathy Bazoian Phelps and Steven Rhodes, *The Ponzi Book: A Legal Resource for Unraveling Ponzi Schemes* (2012), § 2.03[1], at 2–6 nn. 5–6. A small minority of courts has rejected the presumption. *In re Unified Comm'l Capital, Inc.,* 260 B.R. 343 (Bankr.W.D.N.Y.2001), *aff'd,* 2002 WL 32500567 (W.D.N.Y.2002).

Eighth Circuit Court of Appeals. (Nor, for that matter, had any of the bankruptcy judges for this district.) Much of the defense briefing for dismissal featured a strong and direct opposition to the adoption of the presumption, on grounds of substance or policy.

Since then, that problem was faced locally and addressed on the trial court level of the federal courts. It happened in fraudulent transfer litigation out of the *Polaroid Corp.* cases, which are related to the cases at bar. The presumption was vetted, adopted as a fact-finding mechanism, and extended to a variant scenario. *In re Polaroid Corp.*, 472 B.R. 22, 35–36, *appeal pending, motion for cert. den.*, 2013 WL 2455981 (D.Minn. June 6, 2013).

This ruling was made over the strenuous opposition of the defendants in that litigation. It was made after a lengthy vetting of the nature and substance of the presumption and underlying policy considerations. Many of the arguments against it there were raised by the defense here. Any additional approaches or lines of argument that were raised in the docket at bar were pondered for the disposition there. The decision ran to eighty pages. As a foundational ruling for use throughout the span of litigation out of the failed Petters scheme, it will be applied to these adversary proceedings. The defense objections to the presumption on its abstract merits are overruled.

b. **Pleading as to Transfers' Place "in Furtherance of" the Ponzi Scheme.**

Under the judicial articulation of the presumption since its early days, the inference of fraudulent intent applies to transfers made "in furtherance of" a Ponzi scheme. This stems from the essential characteristics of the spawning phenomenon: the churn of money in and out, to keep early investors satisfied, is essential to maintaining the facade of a sound, stable operation that will keep current lenders lulled and will attract future ones. *In re Polaroid Corp.*, 472 B.R. at 35–36. This sort of fraud lies as to those existing creditors and future ones alike.[34] It is effectuated and made firm by the diversion of income and capital from the ostensible purposes represented to later lenders as part of the inducement to lend. Logically, the soundness of the deeming is incontrovertible: an intent to hinder, delay, and defraud all parties in the firmament accompanies the diversion of money to the satisfaction of earlier gulls.

But the qualifier is a key part of the presumption—the transfer must be "in furtherance of" the larger scheme. It is central to the presumption's defensibility. In suing for clawback through avoidance, trustees in other cases have gone beyond parties in the contractual status of lender or investor, suing other persons and entities that receive payment of funds that had been generated through the insidious economics of Ponzi schemes. For those who were the contemplated victims of the purveyor, participating toward their own gain and directly through the transactional, investment-based apparatus of a Ponzi scheme, the bar should not be high for the pleading of furtherance. However, the Trustee here has sued defendants of at least two other classes, beyond "note

---

34. "Existing" creditors could include both older participants who had not yet reached the due date for their rights to pay, or the ones currently gulled into making an advance by seeing other, earlier lenders paid out contemporaneously.

transaction" lenders [35] and providers of operational financing for the whole Petters enterprise structure.

The first class consists of employees of PCI and its Debtor-affiliates. They were sued primarily to recover the amount of bonuses they had received, on top of their ordinary compensation. The Trustee alleges that the bonuses were awarded at the behest of Tom Petters, ostensibly in recognition of the employees' contribution to the enterprise's extraordinary performance in its last years. However, the bonuses were funded by diversion of money from the tightening pyramid of victim-supplied capital.

The second group is made up of charitable organizations, to which PCI or other debtors made donations. For over a decade, Tom Petters made sure his organization got into the local limelight for charitable giving, by generous and well-publicized contributions. The Trustee asserts that Tom Petters caused PCI or other Debtors to be the nominal donor to such charities, using monies taken out of the churn through the scheme and diverting them from the uses promised to new lenders that had provided the funds.

The members of all of these classes of defendants—especially the employee-defendants—accuse the Trustee of not pleading enough facts to make out furtherance in the function of the transfers. The Trustee's broad-brush assertions on that point are typified by the following:

In addition to using the money obtained from later investors to repay earlier investors, Petters used the new investments to prop up PGW and other business that perpetually lost money, fund his extravagant lifestyle, make millions of dollars in charitable donations and pay exorbitant bonuses and other payments to employees, consultants and friends to enhance his credibility and lure additional investors into the Ponzi scheme.

Complaint in *Kelley v. Hay*, ADV 10–4399 [Dkt. No. 1], ¶ 32.[36]

To be sure, this wording is not that concrete. A trustee-plaintiff can suffer dismissal for a failure to plead sufficient facts to plausibly tie a given transfer functionally into the maintenance and perpetuation of a Ponzi scheme. *In re Phoenix Diversified Inv. Corp.*, 2011 WL 2182881, *3 (Bankr.S.D.Fla.2011). Nonetheless, from the understanding of the specific context of this litigation, and considered in conjunction with other allegations of fact in the complaints, the Trustee's pleaded facts in their entirety pass muster for this stage for all three groups of defendants.

▮ For defendants who were larger operational lenders that did not finance particular ostensible "diverting" transactions, the Trustee pleads enough to round out a plausible theory that repayment ostensibly in the ordinary course was part of the big facade that had to be maintained. Those facts include the backdrop pleading

---

**35.** This term (or "note investors") will signify lenders to the debtors that advanced funds on the inducement that they were financing individual "diverting" transactions for specific lots of consumer goods. Tom Petters and his confederates inveigled dozens of such lenders. The lending transactions on these arrangements and the Debtors' transfers in payment on them might be considered the central apparatus of the Petters Ponzi scheme. (It was by no means its whole structure or its full reach, in terms of the flow of funds.)

**36.** The Trustee used this complaint as another of his examplars. It is the second such attached to his Omnibus Memorandum [Dkt. No. 1158].

of the nature and long-term existence of the scheme; the use of new individual lenders' money to make payment on larger revolving lending facilities; the use of the proceeds of the revolving facilities for everyday operations; and (for some) the Debtors' payment of interest at high or very high contractual rates. This is enough to plausibly make out a theory of furtherance.

For non-revolving institutional or fund-based lenders that were not note investors, repayment of past credit that was not part of the scheme's central churn through note investors could still be held "in furtherance of" the scheme. It certainly could not be held that it was not such, as a matter of law.

One such instance, tied directly to the tumultuous closing history of the scheme, was Tom Petters's buccaneering of the assets of the Polaroid Corporation to provide security after the fact to one of the larger and later lenders to PCI and PGW, even though the Polaroid Corporation and its affiliates were not debtors of those creditors. *In re Polaroid Corp.*, 472 B.R. at 52–55 (recognizing applicability of Ponzi scheme presumption to transfer of assets of corporate entities that were related to vehicle of Ponzi scheme by common ownership, but which had not been used in operation of scheme; pledging such assets to meet demands of creditor of vehicle-entities staved off default by them, kept structure of scheme intact for the moment, and hence transfer was "in furtherance of" scheme). Another can be found in *In re Manhattan Inv. Fund Ltd.*, 397 B.R. 1 (S.D.N.Y.2007). In that case, the debtor was an insolvent corporate vehicle for a

Ponzi scheme. The court held that transfers of funds out of the debtor to cover minimum margin requirements on hedge accounts, ostensibly in the ordinary course, was "in furtherance of" the scheme, and hence subject to the presumption of intent. The reason was that the tight focus of the debtor's survival strategy required it to keep the account open as the scheme contracted. 397 B.R. at 13.

So, as long as the Trustee specifically asserts the use of lender infusions in the flow through to earlier investors, and the payment out to earlier lenders and other purposes as a means to avoid default and to sustain the facade against collapse, there is a plausible basis for the furtherance element and the Trustee's complaints against all varieties of lenders are adequately pleaded.

As to charities, a basis for applying the presumption must be different if it is to be recognized; by their nature, the charities favored by Tom Petters were outliers to the scheme that had no profit motive in their transacting with the Debtors.[37] However, the courts have recognized that discrete instances of charitable giving may be considered "in furtherance of" a fraudulent scheme as a matter of fact. *E.g., Hecht v. Malvern Prep. School*, 716 F.Supp.2d 395, 400 (E.D.Pa.2010); *Hays v. Jimmy Swaggart Ministries*, 263 B.R. 203, 209 (M.D.La.1999); *Scholes v. African Ent., Inc.*, 838 F.Supp. 349, 356 (N.D.Ill.1993); *In re C.F. Foods, L.P.*, 280 B.R. 103, 111 (Bankr.E.D.Pa.2002). This, it seems, would be best-supported where the giving was connected with actual transactions within the scheme's central operation (the phenomenon of cultivating

---

**37.** This all assumes that such defendants were legitimate, qualified charitable organizations, and not shams or fronts in cahoots with Petters or otherwise. The Trustee has not pleaded any such accusation against any of the charity-defendants he sued.

customer good will by donating to the customer's favorite charity) or it was well-publicized (with the semblance of business profitability being strong enough to enable such donations, adding to the public luster of the scheme's vehicle and its individual purveyor). These scenarios are perfectly consistent with real human experience. On the thought that Tom Petters had this in mind, and with the pleaded assertion of "enhanc[ing] Petters's credibility and lur[ing] other investors" thereby, even a bare-bones allegation of "furtherance" does not fail the plausibility standard as to charity-defendants.

▇▇▇▇ Finally, a corollary consideration supports the application of the presumption to the cases of the employee-defendants. Tom Petters grew PCI and PGW into a corporate structure that employed several hundred people. By nature, the business that PCI purported to be engaged in was opportunity-driven, time-sensitive, and competitive. Even if the "transactions" were not real, maintaining the facade required Tom Petters and his confederates to act as if they were, and to put lifelike demands on their subordinates to go through the steps of administering and documenting them.

Keeping up this pretense would create situations as stressful as real ones, unexpectedly and often. One can't give a fig for the actual, much higher level of stress incurred by those who really knew the whole thing was not legitimate. But, it is logical that perpetrators in such circumstances would impose their own heightened tensions on their unknowing subordinates more and more, as money had to be found to stave off disclosure and collapse and the pretense of the ordinary level of tension in the diverting business had to be maintained anyway. Rewarding hard-working employees under heavy demands with bonuses ostensibly funded by honestly-earned profit certainly diffuses resentment, and helps maintain allegiance. In any event, keeping a stable of loyal employees, seemingly well-rewarded for their contributions to apparent success, helped maintain the facade for the inducement of future lending, and for the public image of PCI and PGW generally.

There is little or no published case law treating the issue of "furtherance" in application of the presumption to actions against former employees of the purveyor of a Ponzi scheme, whose services kept the edifice standing but who may not have been involved in actually fraudulent conduct themselves. However, there is a corollary in the line of decisions in which independent salespeople or brokers were found essential to the maintenance and prolonging of investment-structured Ponzi schemes, and hence the payment to them of bonuses or commissions on sales of fictitious investments could be considered "in furtherance of" the scheme. *E.g., Warfield v. Byron,* 436 F.3d 551, 560 (5th Cir.2006); *In re Manhattan Inv. Fund, Ltd.,* 359 B.R. 510, 517–518 (Bankr. S.D.N.Y.2007); *In re World Vision Entm't, Inc.,* 275 B.R. 641, 656–657 (Bankr.M.D.Fla.2002).

These decisions rely principally on the broker defendants' de facto participation in the corporate and transactional vehicle for the scheme, to characterize the payment of commission-compensation as "in furtherance of" the scheme. There may be qualitative differences between such services and those of administrative, managerial, and even professional employees. However, the defense has identified no basis for decisively distinguishing them as a matter of law, as to actionability on the matter of

furtherance. The legal theory can be tested when the facts are presented on evidence and on their merits. For now, read as a whole, the Trustee's pleading set out this theory of fact for avoidance claims against employee-defendants in a plausible way.

Per the Trustee's pleading, some of the employee-defendants were compensated at very high, perhaps extraordinarily high levels.[38] Others are said to have received only a modest end-of-year bonus. In defense, the latter insisted that this could not possibly be impugned as fraudulent, even on Tom Petters's part, and could not fail reasonable equivalence in value for a constructive-fraud theory.

Unfortunately, given the current posture of the litigation in motions for dismissal, there was no defensible line to be drawn to separate out those who eventually could be vindicated on such a theory of defense but who would be unfairly burdened in the meantime. The point is, as to this whole group of defendants there is no deficiency in the Trustee's pleading of the causal element for the triggering of the Ponzi scheme presumption, either. For the Trustee's case as to all of them, the "furtherance" is properly pleaded by stating their status as employees, the time and duration of their employment, the circumstances under which they received the bonuses or other extraordinary disbursement in connection with their employment, and the Trustee's factual theory as to the Debtors' true motivation for awarding the bonuses.

As a result, *Ruling # 7B:* The "Ponzi scheme presumption" is a viable means of fact-finding for the Trustee's theory of actually-fraudulent transfer under applicable statute. The Trustee's pleading as to the making of transfers by one or more Debtors "in furtherance of" a Ponzi scheme is sufficient, as to all classes of defendants: lenders to the Debtors, recipients of charitable donations from the Debtors, and employees of the Debtors.

### 2. Badges of Fraud.

As an alternate means to prove actual fraudulent intent on the part of transferor-Debtors, the Trustee pleads the "badges of fraud" theory. This means of fact-finding on intent is well established in Minnesota statute, *see* Minn.Stat. § 513.44(b), as well as the judicial construction of bankruptcy statutes under this circuit's precedent, *Kelly v. Armstrong,* 206 F.3d 794, 798 (8th Cir.2000); *Kelly v. Armstrong,* 141 F.3d 799, 802 (8th Cir.1998); *In re Sherman,* 67 F.3d at 1353–1354.

The "badges" approach permits an inference of actual intent "from the circumstances surrounding the transfer" that is asserted to have been fraudulent. *In re Sherman,* 67 F.3d at 1353. *See also* discussion in *In re Northgate Computer Sys., Inc.,* 240 B.R. 328, 360 (Bankr.D.Minn.1999). It is based on a recognition that certain events, acts, or statuses, in some meaningful combination that coincides with a transfer of assets by a financially-distressed party, evidenced the transferor's intent to hinder, delay, or defraud its creditors. *In re Polaroid Corp.,* 472 B.R. at 55–56. Eleven specific examples of such events are enumerated in

---

**38.** At the highest end, PCI/PGW in-house general counsel David Baer, Esq. is alleged to have received over three million dollars in bonuses over the three-year period before the collapse, in annual doses of about a million dollars each. Complaint in *Kelley v. Baer,* ADV 10–4370 [Dkt. No. 1], ¶ 41.

MUFTA.[39] Once a trustee in bankruptcy suing on a fraudulent transfer establishes "a confluence of several badges of fraud, the trustee is entitled to a presumption of fraudulent intent." *Kelly v. Armstrong*, 141 F.3d at 802.

Numerous defendants argue that the Trustee's complaints lack sufficient fact pleading to set out a plausible theory of actual intent under the badges of fraud approach.

■■■ As to creditor-defendants, the pleaded facts that fall within the scope of statutorily-recognized badges include:

a. The secrecy of the transfers as actually made, and the pervasive non-transparency of the way in which Tom Petters treated and managed note lenders, other creditors, and all other parties outside PCI and PGW. These allegations are illustrated by specific statements: Tom Petters's thoroughgoing refusal to provide note lenders with financial statements; to allow them to contact ostensible sellers or buyers of the consumer goods he purported to be intermediating with lender-infused funds; to inspect the inventory that

ostensibly was passing through his operation; to provide on-line account-structured reporting of the status of transactions for which they were advancing funds; and to have audits done of his ostensible business. Alper Complaint, ¶ 42.[40]

b. The systemic diversion of the proceeds of note lenders' infusions from the ostensible "diverting" transactions, toward the making of payments to maintain the Ponzi scheme. Alper Complaint, ¶ 24.

c. The close coincidence in time, between the transfers out to prior lenders and other recipients and the incurring of the substantial debt to note lenders and other creditors that had been undertaken to fund those very transfers. Alper Complaint, ¶ 29.

d. The extraction of substantial assets out of the Debtors' ownership or control, as a result of the transfers. This removal of assets mounted with the systemic, long-term dissipation of lender infusions without the creation of real, bona fide accounts receivable from the promised diverting transactions, and the absence of oth-

---

**39.** These examples are:
(1) the transfer or obligation was to an insider;
(2) the debtor retained possession or control of the property transferred after the transfer;
(3) the transfer or obligation was disclosed or concealed;
(4) before the transfer was made or obligation was incurred, the debtor had been sued or threatened with suit;
(5) the transfer was of substantially all the debtor's assets;
(6) the debtor absconded;
(7) the debtor removed or concealed assets;
(8) the value of the consideration received by the debtor was reasonably equivalent to

the value of the asset transferred or the amount of the obligation incurred;
(9) the debtor was insolvent or became insolvent shortly after the transfer was made or the obligation was incurred;
(10) the transfer occurred shortly before or shortly after a substantial debt was incurred; and
(11) the debtor transferred the essential assets of the business to a lienor who transferred the assets to an insider of the debtor.
Minn.Stat. § 513.44(b).

**40.** All references to "Alper Complaint" in this discussion are to Dkt. No. 1, ADV 10–4293.

er real, bona fide business activity by PCI and its related entities. Alper Complaint, ¶ 20.

e. The insolvency or inadequacy of capital of the Debtors contemporaneous with the transfers sued on, or following the transfers, as a result of the long-term diversion of funds and the pyramiding of unsatisfied debt, and given the basic nature of a Ponzi scheme. Alper Complaint, ¶¶ 59, 65, 71.

■ As to the employee-defendants, the pleaded facts that the Trustee offers as badges include: [41]

a. Tom Petters or his confederates made or caused payment of money derived from lender infusions through the Ponzi scheme to directors, officers, employees, or consultants of the Debtor-entities, and to friends and others. Hay Complaint, ¶ 33.

b. Tom Petters used funds derived from the operation of the scheme to "pay exorbitant bonuses and other payments to employees, consultants, and friends to enhance his credibility and lure additional investors into the . . . scheme." Hay Complaint, ¶ 32.

c. On multiple occasions, Tom Petters or his confederates extracted money from PCI (originally derived from lender infusions) to be transferred to related entities within Tom Petters's enterprise structure, including PGW, to enable those entities to pay compensation, bonuses, severance payments, commissions, or other incen-

tives to employees. These transfers were also made to other individuals. Hay Complaint, ¶ 49.

d. The individual employee-defendants accepted the payments despite the unreasonableness of their amounts. They "failed to exercise reasonable due diligence with respect to the source and amount of the payments." Hay Complaint, ¶ 57.

e. The payments thus received were disproportionately large relative to the recipients' compensation. They were not made in furtherance of a legitimate business purpose. Hay Complaint, ¶ 55.

f. The amounts of bonuses and other transfers to individual employee-defendants exceeded the contemporaneous market value of equivalent types of payment for equivalent performance. Hay Complaint, ¶ 56.

g. Tom Petters made such payments to employees and other such individuals as part of the Ponzi scheme, to impress current and future investors, to add credibility to his ostensible operation, and to convey that his companies were trustworthy and profitable. Hay Complaint, ¶ 58.

As to employee-defendants, these fact allegations appear to match qualitatively to the statutory examples of:

a. payment to an insider, Minn.Stat. § 513.44(b)(1);

b. contemporaneous or ensuing insolvency of the Debtor-transferor, Minn.Stat. § 513.44(b)(9);

c. transfer in near-contemporaneity with the incurring of substantial

---

41. The Trustee used his complaint against PCI employee Thomas Hay [ADV 10–4399, Dkt. No. 1 ("Hay Complaint")] as a represen- tative example of badges of fraud as they applied to employee-defendants challenging his pleading.

debt, Minn.Stat. § 513.44(b)(10); and

d. lack of reasonable equivalent value received by the Debtor-transferor for the property transferred, Minn. Stat. § 513.44(b)(8).[42]

The plausibility of the Trustee's badges-based pleading is not quite as powerful for employee-defendants as it is for creditor-defendants. But, in the end, these points of fact if proven could make out a "confluence of several" from which a fact-finder could draw an inference of fraudulent intent on the part of the relevant Debtor, as harbored and acted out by Tom Petters. This is not a matter of any particular one of the cited fact allegations preponderating in its own right if proven. It is also more than an arithmetic sum of the individual weight of each point, credited toward the inference.

Rather, as the Supreme Court noted in *Iqbal,* a holistic examination may be brought to bear to gauge the sufficiency of this pleading on the entirety of its text and from its context—i.e., the historical phenomenon of the Petters Ponzi scheme in several legal forums. Using judicial experience and taking a common-sense stance, a fact-finder could well infer intent to hinder, delay, or defraud on Tom Petters's part, of the right orientation and sort, from these facts if they were proven via live evidence and corroborated by other proof. *E.g., In re Bayou Group, LLC,* 362 B.R. 624, 634 (Bankr.S.D.N.Y.2007) (in context of defendants' motions for dismissal, and on itemization of aspects of investment-based Ponzi scheme and pervasively deceptive conduct of its purveyors, "[i]t is difficult to imagine a more comprehensive

compendium of 'badges of fraud,' all of which compel the inference that the redemption payments . . . were made by the [debtor] with the actual intent to hinder, delay and defraud both present and future creditors . . . ."). In the end, some individual defendants may be subjected to avoidance remedies for less significant amounts of money simply because they were unwittingly ensnared by Tom Petters and then were paid with money mulcted from note lenders. Such an outcome would be unfortunate. But on the Trustee's fact pleading, if proven, it would not lack a basis in law.

Thus, ***Ruling # 7C:*** The Trustee's pleading on an actually-fraudulent transfer is sufficient, to the extent that it is directed toward fact-finding on intent using the badges of fraud method under applicable law.

## C. Pleading Constructively–Fraudulent Transfers.

State and federal fraudulent transfer statutes provide for an alternate basis for granting relief in avoidance, commonly termed "constructively-fraudulent transfer." Minn.Stat. §§ 513.44(a)(2) (as to present and future creditors) and 513.45 (as to present creditors); 11 U.S.C. § 548(a)(1)(B). Constructively-fraudulent transfers are those through which a debtor did not receive "a reasonably equivalent value" for the property transferred, under circumstances of contemporaneous or resulting insolvency or inability to meet obligations on debts as due, on the part of the debtor. *E.g., In re Craig,* 144 F.3d 587, 590–591 (8th Cir.1998); *In re Bargfrede,* 117 F.3d 1078, 1080 (8th Cir.1997) (both applying text of 11 U.S.C. § 548 now codified at § 548(a)(1)(B)).

---

**42.** Such examples under state statute may be considered for the making of an inference of actual intent, in the application of 11 U.S.C.

§ 548(a)(1)(A). *In re Sherman,* 67 F.3d at 1354.

Numerous defendants contend that the Trustee's pleading on this theory is deficient under a plausibility-oriented analysis. One issue under this objection goes to a very basic level, the rule on which to analyze the constructive-fraud counts of the Trustee's complaint, i.e., Rule 8(a) or Rule 9(b). The other two go to the specific fact content pleaded by the Trustee.

### 1. The Standard: Plausibility or Particularity? *Fed.R.Civ.P. 8(a) v. Fed.R.Civ.P. 9(b)*.

■ Seemingly, the Trustee kicked off this issue himself in his own initial written argument. Trustee's Omnibus Memorandum [Dkt. No. 1158], pp. 69–70. Numerous defendants rose to challenge the content of the Trustee's pleading on reasonably equivalent value and insolvency, insisting that it lacked particularity as to the basic facts through which he would have to prove these two elements in their statutory variants. They demand substantially more detail than first pleaded, on the ground that these elements are "the circumstances constituting fraud" for which Fed.R.Civ.P. 9(b) requires a high degree of particularity. The Trustee maintains that Fed.R.Civ.P. 8(a) sets the standard for his pleading on constructive fraud, i.e., "a short and plain statement" of fact going to these elements, and he argues that he has more than met that.

Numerous courts have addressed the sufficiency of pleading as to these two elements. A few, including *Kranz v. Koenig*, 240 F.R.D. 453, 455–456 (D.Minn. 2007) have applied the "heightened" particularity standard of Rule 9(b) to actions for

the avoidance of constructively-fraudulent transfers.[43] *See also General Electric Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1078–1079 (7th Cir.1997) (holding that complaint was well-pled on constructive-fraud count, under standard of Rule 9(b)). However, these two courts seemed to assume that Rule 9(b) applied. Neither expressly posed or made a choice between the two rules based on a specific analysis.

The greater number of published decisions do treat the choice, and they reject Rule 9(b) as inapplicable to the constructive-fraud variant of fraudulent transfer law. Most of these rulings come out of the bankruptcy courts. *E.g., In re Verestar, Inc.*, 343 B.R. 444, 460 (Bankr.S.D.N.Y. 2006) (citing *In re White Metal Rolling and Stamping Corp.*, 222 B.R. 417, 428–429 (Bankr.S.D.N.Y.1998); *In re Stratton Oakmont, Inc.*, 234 B.R. 293, 319 (Bankr. S.D.N.Y.1999); *China Resource Prods. (U.S.A.), Ltd. v. Fayda Int'l, Inc.*, 788 F.Supp. 815, 819 (D.Del.1992); *Van–Am. Ins. Co. v. Schiappa*, 191 F.R.D. 537, 542 (S.D.Ohio 2000); *In re Air Cargo, Inc.*, 401 B.R. 178, 192 (Bankr.D.Md.2008); *In re Allou Distribs., Inc.*, 379 B.R. 5, 17 (Bankr.E.D.N.Y.2007); *In re Bernard L. Madoff Inv. Secs. LLC*, 454 B.R. 317, 329 (Bankr.S.D.N.Y.2011) ("*Picard/Cohmad*")).

Ultimately, these decisions have the better of the issue. This is because the modern statutory articulation of a constructively-fraudulent transfer does not consider the debtor-transferor's intent at all.[44] Rule 9(b) requires particularity because

---

**43.** In *Kranz v. Koenig*, the plaintiff's fraudulent-transfer claim was dismissed with grant of leave to amend, on the ground that the complaint lacked particularity in its constructive-fraud count.

**44.** *See* First Memorandum [Dkt. No.1951], 22.

cases premised on fraud of any sort first require proof of a negative—the materially—false representation that was knowingly made with intent to induce. Then they require proof of reliance. This often gets complicated and usually it is done on circumstantial evidence. Comparably, the "who, what, when" of an actually-fraudulent transfer must evidence some sort of projected falsity, against the actual truth. This simply is not necessary where the statutory elements go purely to facts of a financial nature. Rule 9(b) does not apply to claims on constructively-fraudulent transfers, because fraud in the traditional sense need not be proven as a matter of fact in order to recover. As a result, the plausibility standard premised on Rule 8(a) and developed under *Twombly* and *Iqbal* is the one to be applied to the Trustee's counts under this theory.

Thus, ***Ruling # 7D:*** The heightened pleading requirements of Fed.R.Civ.P. 9(b) do not apply to the Trustee's avoidance claims under the theory of a constructively-fraudulent transfer. The pleading standard of Fed.R.Civ.P. 8(a), as construed by the Supreme Court in *Twombly* and *Iqbal,* is the one to be applied to those counts of the Trustee's complaints.

### 2. Pleading as to Reasonably Equivalent Value.

Many defendants, particularly the lenders, seek dismissal on the argument that the complaints inadequately plead on the issue of whether the Debtors received reasonably equivalent value for the payments they made to the defendants. The Trustee's template pleading does specify the payments *made* by the Debtors, with enough detail to identify them by date and amount. The contention is with the complaints' content as to what the Debtors *received,* and the reasons why the Trustee asserts a lack of reasonable equivalence. The gist of the defense's accusations varies, as between lender-defendants and employee-defendants.

#### a. As to Lender–Defendants.

■ The Trustee acknowledges in his pleading that the Debtors made the payments to the lender-defendants to pay down debt on preexisting individual or multiple "note transactions," on revolving lines, or on other prior extensions of credit. The lenders' challenge to this pleading on reasonably equivalent value concerns both fact and law.

First, they point out that the Trustee identifies no consideration for the payments to them, other than the repayment on debt. This, they say, is legally crucial, and merits a dispositive outcome in their favor now.

As their main support, they assert the proposition that "[r]epayment of an antecedent loan comes within the 'reasonably equivalent value' rule," *B.E.L.T., Inc. v. Wachovia Corp.,* 403 F.3d 474, 478 (7th Cir.2005). Put another way, the proposition is that where a tender of funds results in a debtor "reliev[ing] itself of an outstanding debt equal to the face amount of" the payment, the debtor received reasonably equivalent value and there can be no constructively-fraudulent transfer. *In re Rosen Auto Leasing, Inc.,* 346 B.R. 798, 805 (8th Cir. BAP 2006). *See also In re Schultz,* 368 B.R. 832, 837 (Bankr.D.Minn. 2007).[45]

Thus, as the lender-defendants would have it, absent other pleaded facts that

---

**45.** Whether articulated or not, the conclusion has its starting point in the statutory definition of "value." *See,* in pertinent part, Minn. Stat. § 513.43(a) ("Value is given for a transfer ... if, in exchange for the transfer ..., an antecedent debt is secured or satisfied ....")

indicate a lesser value received by the Debtors, the payments they received only served to abate pre-existing debt, in interest and principal; and because that reduction was in like measure, dollar for dollar, there was reasonable equivalence in the passing of the value. Thus, they argue, the Trustee's constructive-fraud claims against them fail to state a claim upon which relief in avoidance could be granted under applicable law, as to their receipt of both principal repayment and interest, and these counts must be dismissed.

The Trustee responds in a number of different ways. All of his arguments trace back to his connotative characterization of the lender-defendants' earnings from the Petters borrowers as "false profits." He likely gleans this classification from past decisions like *In re Bayou Group, LLC,* 362 B.R. at 634–636. By this phrase, the Trustee denotes returns to note lenders that he characterizes as too large to be reasonably perceived as legitimate, and which in fact had nothing to do with bona fide diverting transactions of the sort they were ostensibly lending on. There is also an insinuation that the returns were the product of an indiscriminate snapping-up by investors who should have realized that something in the Petters operation was not right and that was grossly excessive in any event. As the Trustee would have it, there is no credibility in the lender-defendants' assertion that they were just doing business and it was ordinary. He cites the allegedly-anomalous borrowing terms that

Tom Petters was willing to accept, plus all other knowledge of Petters and his operation that the lenders would have had at the time.

On that foundation, the Trustee argues that only "innocent" investors may retain principal and/or interest against avoidance after the failure of a Ponzi scheme, under an assertion of reasonable equivalence via the satisfaction of debt. He cites two rulings out of the *Madoff* litigation, *Madoff/Chais* and *In re Bernard L. Madoff Inv. Secs., LLC,* 440 B.R. 243 (Bankr. S.D.N.Y.2010) (*"Madoff/Merkin"*). As the *Madoff/Chais-Madoff/Merkin* court saw it, once a Ponzi scheme has failed, only claims properly in the nature of restitution under nonbankruptcy law can be considered as "antecedent debt," and thus "value." As a result, under this rationale, only "innocent" investors that reasonably believed that they were investing in a legitimate enterprise would be entitled to the status of hypothetical restitution recipient and then a favorable finding on reasonable equivalence. *Madoff/Merkin,* 440 B.R. at 261–263; *Madoff/Chais,* 445 B.R. at 333–334. *See also In re Bayou Group, LLC,* 362 B.R. at 634–636. The Trustee equates that sort of innocence-based scienter to "good faith." Then he argues that good faith cannot be adjudged on a motion that must focus only on the pleadings.[46]

In reply, some defendants, including WestLB AG, New York Branch ("WestLB") argue that the courts in *Ma-*

---

and 11 U.S.C. § 548(d)(2)(A) (" 'Value' means ... satisfaction or securing of a present or antecedent debt of the debtor.... "). The reasonable equivalence then would derive from the corresponding dollar-for-dollar abatement of liability on the debt.

**46.** The Trustee further argues that reasonably equivalent value must be adjudged from the

perspective of other creditors of the estate, and not of any of the Debtors. He also invokes "longstanding public policy" against allowing the retention of "false profits" in the remediation of a failed Ponzi scheme. Trustee's Omnibus Memorandum [Dkt. No. 1158], 74–76.

*doff/Chais* and other decisions cited by the Trustee did not examine good faith as part of an analysis of constructive fraud on its own merits. Reply [of Defendant WestLB AG New York Branch] in Response to Trustee's Omnibus Memorandum, *Kelley v. Opportunity Finance, LLC et al* [ADV 10–4301, Dkt. No. 50], 7–8. WestLB argues that it cannot be required to show its past good faith as part of its defense of the Trustee's constructive-fraud claims, because it was (unlike the defendant in *Madoff/Chais* ) entitled to repayment under a written loan agreement.

Another *Madoff*-spawned decision counters this argument, at least for the purposes of gauging the fact pleading for a claim under the theory the Trustee espouses. In *In re Bernard L. Madoff Inv. Secs. LLC*, 454 B.R. 317 (Bankr.S.D.N.Y. 2011) ("*Madoff/Cohmad* "), the defendant made a similar argument but the court refused to dismiss the Trustee's claims for constructively-fraudulent transfers. The reasoning was that the trustee there had "plausibly alleged a lack of innocence sufficient to" merit his pursuit of the issue through discovery. *Madoff/Cohmad*, 454 B.R. at 337.

The *Madoff/Cohmad* court sees the factual issue of reasonably equivalent value as requiring an inquiry into "the totality of the circumstances, including the 'armslength nature of the transaction; and ... the good faith of the transferee'." 454 B.R. at 334. This falls right into line with the conception of reasonably equivalent value under binding precedent in this circuit, *In re Ozark Rest. Equip. Co., Inc.*, 850 F.2d 342, 345 (8th Cir.1988), as well as other local authority, *e.g., In re Kendall*, 440 B.R. 526, 533 (8th Cir. BAP 2010) and *In re Schultz*, 368 B.R. at 836. Putting

that approach into play dovetails well with the Eighth Circuit's dictate to construe a complaint's fact pleading in a holistic fashion, for the application of Rules 8(a) and 12(b)(6). *Braden v. Wal–Mart Stores, Inc.*, 588 F.3d at 594.

As to WestLB and the other defendants making this argument, including its codefendants, the Trustee has pleaded enough facts for a plausible theory of lack of innocence. *E.g., Kelley v. Opportunity Finance LLC, et al,* ADV 10–4301, Complaint [Dkt. No. 1], ¶ 63 ("the high rates of return that were promised to investors promoted two essential goals of the Ponzi scheme ... [including] to entice investors such as Opportunity Finance to invest without employing reasonable due diligence ...."); 110 (individual principals at Opportunity Finance were aware of changes in business practices of ostensible diverting customers of PCI that should have called into question falsified transaction documentation proffered to Opportunity Finance by PCI for verification); 111 (principals of Opportunity Finance were aware of Debtors' pervasive lack of transparency and nondisclosure as to note lenders; WestLB continued to lend to PCI and its affiliates despite another major lender's withdrawal from lending relationship with PCI). With the inherently fact-intensive nature of the broader issue, this is not a matter of form as WestLB and the other defendants would have it treated, but substance; and the substance consists of the entirety of the pleading. Where the Trustee has pleaded facts that call into question a defendant's innocence in its past participation in the Ponzi scheme of a debtor-transferor, the potential defense of reasonable equivalence via debt satisfaction is addressed sufficiently and the pleaded

claim cannot fail as a matter of law.[47] *Madoff*, 454 B.R. at 337.

### b. As to Employee–Defendants.

■ The employee-defendants' argument on reasonably equivalent value goes only to the adequacy of the Trustee's fact pleading; they do not make a frontal attack on the underlying legal theory at this point. They focus on the established precept that reasonably equivalent value is a question of fact,[48] under which the court "must consider all aspects of the transaction and 'carefully measure the value of all benefits and burdens to the debtor' " in the examined exchange of value.[49] But, the employee-defendants argue, the Trustee has not pled with any specificity how the value of their rendered service to the Debtors was so much less than the amount of the bonuses they received, that it failed reasonable equivalence. At least one court has taken a trustee to task on this very point, when the subject of avoidance would have been bonuses and other compensation paid to a debtor's former employees. *In re Hydrogen, L.L.C.*, 431 B.R. 337, 352–353 (Bankr.S.D.N.Y.2010) (characterizing trustee's fact pleading as "little more than a formulaic recitation of the elements" of a fraudulent transfer, with "a complete absence of facts" going to the respective values of compensation and services).

This fact issue is no less subject to the *Iqbal/Twombly* plausibility requirement than any other. In this specific scenario, a trustee must plead sufficient facts to support a reasonable inference that the value of what the debtor paid ostensibly on account of the recipient-employee's services, was so out of line with the real value of the performance in marketplace terms that it failed a reasonable equivalence.[50]

The Trustee's adversary proceeding against former employee John McGaunn is an appropriate illustration.[51] In his Reply Memorandum, Defendant McGaunn states

---

**47.** This distinguishes these cases from *In re Carrozzella & Richardson*, 286 B.R. 480, 491 (D.Conn.2002), on which the defense relies heavily. There, the court explicitly observed that "there [was] nothing in the record that Defendants were anything but innocent investors," and there had been "nothing to suggest [to them] that the Debtor was operating a Ponzi scheme." *Id.* Here, the Trustee used his complaint to make a preemptive challenge to the defendants' assertion of innocence, by questioning any notion that they properly accepted the Petters transactions as good deals without doubt or more inquiry. And, in the last instance, it is far premature to adopt or reject the judicially-developed rule of decision used in *Cohmad*, that overrides the thrust of the statutory definition of value and the statutory concept of reasonable equivalence. Neither the Trustee nor his opponents briefed the choice pointedly or at sufficient length; and it really is better-suited for treatment on summary judgment after evidence for all facts is more fully developed and assembled, and theories are better-focused.

**48.** *In re Ozark Rest. Equip. Co., Inc.*, 850 F.2d at 344; *In re Metro. Steel Fabricators, Inc.*, 191 B.R. 150, 154 (Bankr.D.Minn.1996).

**49.** *In re Young*, 152 B.R. 939, 945 (D.Minn. 1993), *rev'd on other grounds*, 82 F.3d 1407 (8th Cir.1996); *In re Metro. Steel Fabricators, Inc.*, 191 B.R. at 154.

**50.** The use of market-set reference points is suggested by *In re Richards & Conover Steel, Co.*, 267 B.R. 602, 612 (8th Cir. BAP 2001) ("The concept of reasonably equivalent value is a means of determining if the debtor received a fair exchange in the marketplace for the goods transferred."—or, as here, the services rendered).

**51.** Defendant McGaunn was identified as the president of Petters Hospitality Group, an affiliate of PGW. The Trustee's template-structured complaints against employee-defendants resulted in numerous motions for dismissal that had content in argument virtually identical to that presented by Defen-

that the Trustee "alleges virtually no facts pertaining to the value McGaunn gave to the Debtors," and "does little more than list the dates and amounts of the payments that McGaunn allegedly received...." [ADV 10–4340, Dkt. No. 16], 15. In the Trustee's complaint, he had alleged that defendant McGaunn "gave nothing of value or provided value that was less than reasonably equivalent value in exchange for" his bonus compensation. Complaint [ADV. 10–4340, Dkt. No. 1], ¶ 39. The Trustee itemizes the bonuses by date, payor, and amount in the next paragraph. Later, he alleges that "the Transfers to Defendant [McGaunn] exceeded the market value of equivalent types of payments for equivalent performance during the relevant time period," and "are disproportionately large relative to Defendant's salary." Complaint [ADV 10–4340, Dkt. No. 1], ¶¶ 45–46. This was all that the Trustee had pleaded as to the value given by defendant McGaunn, or by any of the other employee-defendants for whom he used the same template of pleading.

The Trustee's response to this argument is lackluster and not really on point.[52]

Nonetheless, as to employee-defendants, his pleading on reasonably equivalent value is sufficient under the plausibility standard. The Trustee's factual assertions are only allegations at this point. Nonetheless, they "must be taken as true and *must be read to include any theory on which the plaintiff may recover.*" *In re Brandon Overseas, Inc.*, 2010 WL 2812944, *6 (Bankr.S.D.Fla.2010) (emphasis added).[53] The Trustee's allegations are not replete with detail as to backdrop facts, for defendant McGaunn; for example, there is no recitation as to the amount of his base compensation, duties, services performed, quality of performance, and so forth. Nor is there any statement as to what a reasonable bonus would have totaled for a similarly-situated employee at another company. Nonetheless, the statements at ¶¶ 45–46 of the Trustee's complaint queue up the bare minimum of facts to put the issues of value and reasonable equivalence properly in controversy:

> 45. The Transfers[54] to Defendant exceeded the market value of equivalent types of payments for

dant McGaunn—at least as to the constructive-fraud counts.

**52.** The Trustee insists in a broad-brush way that a fact-intensive inquiry regarding value received is premature. However, the only case he cites, *In re Chicago, Missouri & Western Ry. Co.*, 124 B.R. 769, 773 (Bankr.N.D.Ill. 1991), does not hold that an analysis on reasonably equivalent value is premature upon a motion for dismissal. As to his more conclusory assertion that his pleading is sufficient because it provides notice of what he intends to prove, he cites *In re O.P.M. Leasing Servs., Inc.*, 32 B.R. 199, 203 (Bankr.S.D.N.Y.1983), a decision from the prehistory of *Twombly* and *Iqbal*. A decision from 1983 cannot be assigned any viability under a new pleading standard that contemplates not only notice but also plausibility. To present a claim plausibly, a complaint must plead case-specific facts. That is why the court in *Hydrogen,*

*LLC*—the same jurisdiction that generated the *O.P.M. Leasing Servs.* decision but two decades later—not only parsed the trustee's pleading of constructive fraud, but also rejected it via dismissal.

**53.** This is very much the thought of the Supreme Court's post-*Twombly/Iqbal* observation in *Skinner v. Switzer*, — U.S. at ——, 131 S.Ct. at 1296.

**54.** "The Transfers" had been defined as a total of $300,000.00 in bonuses awarded to defendant McGaunn in 2006–2008. In ¶ 44 of the complaint McGaunn is identified as "the former President of Petters Hospitality Group of PGW, the Managing Director of Petters Real Estate Group, a wholly owned subsidiary of PGW, managed Petters' home in Manalapan, Florida and was part of Petters' and his affiliated entities' management team and inner circle at all times relevant herein."

equivalent performance during the relevant time period.

46. The Transfers are disproportionately large relative to Defendant's salary.

47. Defendant received and accepted the Transfers despite the unreasonable amounts of the payments and failed to exercise reasonable due diligence with respect to the source and amount of the payments.

And, with a holistic view of the pleadings, the pleaded backdrop of the Ponzi scheme alone gives additional bolster for adjudging employees' bonuses collectively as excessive in relation to the actual value of the real performance or contemporaneous market norms. That lies in the pleaded theory, previously discussed, of loyalty induced and employee suspicion defused by an overwhelming pretense of success, manifested in the generosity of the bonuses and the glow of Tom Petters's crafted public presence. McGaunn Complaint [ADV. 10–4340, Dkt. No. 1], ¶ 49.

All of these facts, if proven by sufficient cogent evidence, could support an inference that the size of the bonuses now targeted for avoidance actually reflected a role in Tom Petters's pervasive strategy to maintain the Ponzi scheme, rather than market-gauged compensation merited for employees' contributions to sustain exceptional enterprise performance. The Trustee will have to adduce market-derived evidence to make out the full picture he presents in pleading. However, his pleaded theory of fact is not implausible within its four corners, against the backdrop of the scheme and Tom Petters's need to see that its facade was maintained both inwardly and outwardly. There is no warrant to either dismiss or mandate repleading, as to the constructive-fraud counts against employee-defendants.

As to the conclusions on reasonably equivalent value in their entirety, **Ruling # 7E:** For his theory of avoidance as a constructively-fraudulent transfer, the Trustee's complaint plausibly pleads the element of a lack of reasonably equivalent value, as to both the lender-defendants and the employee-defendants.

### 3. Pleading as to Insolvency and Fiscal Inadequacy.

The other main element of a constructively-fraudulent transfer under both state and federal law is insolvency or another defined form of fiscal inadequacy on the part of the transferring debtor, contemporaneous with or consequent to the act of transfer. Minn.Stat. §§ 513.44(a)(2)(i)—(ii)[55] and 513.45(a)[56]; 11 U.S.C. § 548(a)(1)(B)(ii)(I)—(III).[57]

---

55. This statute (applicable to present and future creditors) requires a showing that the debtor

(i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction; or
(ii) intended to incur, or believed or reasonably should have believed that he or she would incur, debts beyond his or her ability to pay as they became due.

56. This statute (applicable to present creditors) requires a showing that, related to the transfer, "the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer...."

57. This statute requires a showing that the debtor
(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;
(II) was engaged in business or a transaction, or was about to engage in business or

Several prominent defendants challenge the Trustee on the adequacy of his fact-pleading on this element. General Electric Capital Corporation, for instance, pointed out that the Trustee's complaint against it tersely stated that the payments to it left the Debtors "unreasonably small capital," and nothing else in any detail. [ADV 10–4418, Dkt. No. 1], ¶ 111. In the Alper Complaint, the recitation is that "[a]t all times material hereto, the Debtor, at the time of the Transfers, was insolvent, or in the alternative, the Debtor became insolvent as a result of the Transfers." [ADV 10–4293, Dkt. No. 1], ¶ 71.

In an abstract way, these defendants are correct; the words used to plead this element are conclusory, a bare paraphrasing of particular statutory language.

Nonetheless, in rejoinder the Trustee is correct. This argument is met in two ways.

The first is by recognizing the relative simplicity of one of the variants of the requirement. Under statute, "insolvent" is a defined term in both MUFTA and the Bankruptcy Code. It contemplates a straightforward meaning: the "balance sheet" conception of insolvency, debts versus assets. Minn.Stat. § 513.42(a)-(b); [58] 11 U.S.C. § 101(32)(A).[59] Under the gov-

erning law, this puts the essence of the Trustee's factual contentions on insolvency right up the flagpole; there was no need to make dollar-specific averments of fact going to the status of the relevant Debtor's balance sheet.

The second is through a context-minded reading of the complaints as a whole, and the undeniable essence of the phenomenon that spawned every last one of these controversies.

As the Trustee points out, courts from the United States Supreme Court on down recognize that insolvency is an invariable characteristic of any entity that serves as the vehicle for a Ponzi scheme. It is inherent in the mechanics and process of the phenomenon; debt rapidly pyramids when capital inflow is siphoned away from true, profit-generating activity toward repayment of earlier investors (plus operating expenses and the purveyor's self-aggrandizing chicanery). This quickly results in remaining assets that are grossly insufficient to meet the piled-up debt. *See, e.g., Cunningham v. Brown*, 265 U.S. 1, 8, 44 S.Ct. 424, 68 L.Ed. 873 (1924) (the *original* Ponzi scheme case, noting that Charles Ponzi "was always insolvent, and became daily more so, the more his business succeeded"); *Scholes v. Lehmann*, 56 F.3d 750, 755 (7th Cir.1995) (holding that the

---

a transaction, for which any property remaining with the debtor was an unreasonably small capital; [or]
(III) intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured....

**58.** This statute provides, in pertinent part:
(a) A debtor is insolvent if the sum of the debtor's debts is greater than all of the debtor's assets, at a fair valuation.
(b) A debtor who is generally not paying debts as they become due is presumed to be insolvent.

**59.** This statute provides, in pertinent part:
(32) The term "insolvent" means—
(A) with reference to an equity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of—
(i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors....

inevitable and mounting claims of investors made the Ponzi scheme insolvent from the beginning); *In re Indep. Clearing House Co.*, 77 B.R. 843, 871 (D.Utah 1987) (within the context of an adversary proceeding under 11 U.S.C. § 547(b), "[b]y definition, an enterprise engaged in a Ponzi scheme is insolvent from day one").

As the Trustee would have it, the insolvency element is pleaded more than adequately by his bare statements of statutory text and his description of an actual, long-term Ponzi scheme that ran over a duration that encompassed the subject transfers to all of the defendants.[60] This, he says, meets pleading requirements under all of the alternatives: "balance sheet" insolvency, "unreasonably small capital," and intent to incur debt beyond repayment ability.

Reacting to this, defendants such as Opportunity Finance, LLC argue that this is a misuse of the Ponzi scheme presumption far outside its prior and exclusive application to claims of actually-fraudulent transfer. Reply by Opportunity Finance, et al [ADV 10–4301, Dkt. No. 49], 15. Arguing that the presumption cannot be extended to claims of constructively-fraudulent transfer, Opportunity Finance demands that the Trustee plead (and later prove) dollar-specific facts that would quantify the insolvency or fiscal inadequacy of the relevant Debtor, as of or after each transfer that the Trustee seeks to have avoided.

Opportunity Finance's argument is a diversion that is simply wrong on its premise. The Trustee does urge the application of something close to a presumption, at the very least a strong inference; but it is not the presumption or inference *of fraudulent*

*intent* that is at issue throughout the Petters-spawned litigation. *See In re Polaroid Corp.*, 472 B.R. at 34–36 (Ponzi scheme presumption) and 55–60 (inference of actual fraudulent intent enabled by proof of badges of fraud). *See also Kelly v. Armstrong*, 141 F.3d at 802 (a presumption of fraudulent intent arises on trustee's proof of "confluence of several badges of fraud"). *This* presumption, or inference, would go to *financial condition*, and not to intent. Though its origin lies equally in the basic and invariable nature of a Ponzi scheme, its cogency is to be measured on its own merits and its applicability is different. However it is categorized as an adjudicatory tool, the theory is not improper in its place.

The Trustee's cited authority to support his pleading content and his suggested fact-finding on statutory insolvency is long- and widely-recognized. A number of courts have applied its logic in fairly perfunctory ways. *E.g., In re Evergreen Sec., Ltd.*, 319 B.R. 245, 253 (Bankr.M.D.Fla. 2003); *In re Ramirez Rodriguez*, 209 B.R. 424, 432 (Bankr.S.D.Tex.1997). *See also In re Mark Benskin & Co., Inc.*, 161 B.R. 644, 650 (Bankr.W.D.Tenn.1993) (where debtor was operating Ponzi scheme and funding payments to earlier investors with money lent by later ones, "[i]t would seem axiomatic that the debtor was operating its business with unreasonably small capital"). It is telling that there is no extant published decision in which a court denies the basic premise that insolvency is inevitable within a Ponzi scheme's operation. Nor is there an extant decision where a trustee's claims on theories of constructive fraud were denied because the debtor was demonstrably solvent, as a matter of fact, on the date of a transfer.

---

**60.** He also insists that these facts, once proven, would establish insolvency "as a matter of law." That, however, is an issue and a legal characterization for later vetting.

Thus, *Ruling # 7F:* The Trustee's pleading on the insolvency- and fiscally-related element of a constructively-fraudulent transfer is not deficient, and need not be remedied by amendment.

## CONCLUSION

The rulings on this second group of issues are reprised, as follows:

*Ruling # 6A:* To plead his standing to sue to set aside a transfer to any defendant as fraudulent under Minnesota law, the Trustee must identify by name, in his complaint, at least one unsecured creditor with a claim allowable against the estate whose standing he uses to sue that defendant, which creditor would have had the right to sue to avoid that transfer on the date that that Debtor filed for bankruptcy relief. The Trustee's generic pleading as to the existence of a predicate creditor does not satisfy Rule 8(a). To maintain his claims against the defendants beyond the stage of these motions, he must remedy this defect.

*Ruling # 6B:* To the extent that the Trustee seeks to have the statute of limitations of Minn.Stat. § 541.05, Subd. 1(6) eased by the application of the discovery allowance, he must plead that his predicate creditor did not know of or discover the fraud of the Petters Ponzi scheme, at any time until within the six years before the date on which the bankruptcy petition was filed for the relevant Debtor. He must also plead the specific facts that prevented the predicate creditor from obtaining such knowledge and from discovering the fraud. The defects in the Trustee's original pleading must be remedied, at the appropriate time.

*Ruling # 7A:* The Trustee's template pleading to identify the transfers that he would have avoided plausibly links them to the alleged acts of fraud on the Debtors' part, as contemplated by the substantive law of fraudulent transfer.

*Ruling # 7B:* The "Ponzi scheme presumption" is a viable means of fact-finding for the Trustee's theory of actually-fraudulent transfer under applicable statute. The Trustee's pleading as to the making of transfers by one or more Debtors "in furtherance of" a Ponzi scheme is sufficient, as to all classes of defendants: lenders to the Debtors, recipients of charitable donations from the Debtors, and employees of the Debtors.

*Ruling # 7C:* The Trustee's pleading on an actually-fraudulent transfer is sufficient, to the extent that it is directed toward fact-finding on intent using the badges of fraud method under applicable law.

*Ruling # 7D:* The heightened pleading requirements of Fed.R.Civ.P. 9(b) do not apply to the Trustee's avoidance claims under the theory of a constructively-fraudulent transfer. The pleading standard of Fed.R.Civ.P. 8(a), as construed by the Supreme Court in Twombly and Iqbal, is the one to be applied to those counts of the Trustee's complaints.

*Ruling # 7E:* For his theory of avoidance as a constructively-fraudulent transfer, the Trustee's complaint plausibly pleads the element of a lack of reasonably equivalent value, as to both the lender-defendants and the employee-defendants.

*Ruling # 7F:* The Trustee's pleading on the insolvency- and fiscally-related element of a constructively-fraudulent transfer is not deficient, and need not be remedied by amendment.

These rulings will apply to each remaining motion for dismissal according to the

926

individual posture of each defendant, as will those from the First Memorandum. After a third memorandum is entered on the remaining "consolidated issues," and other prerequisites receive ruling, this litigation will be in a position to go forward.